## STUBBS v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit.   March 7, 1918.   Rehearing Denied June 3, 1918.)

No. 3054.

CONSPIRACY ⬤⇒47—POST OFFICE ⬤⇒49—TO DEFRAUD BY USING MAILS—OFFENSE—EVIDENCE—SUFFICIENCY.

In a prosecution under Criminal Code (Act March 4, 1909, c. 321) §§ 37, 215, 35 Stat. 1096, 1130 (Comp. St. 1916, §§ 10201, 10385), for a conspiracy to devise a scheme to defraud by using the mails, and of devising a scheme to defraud, evidence *held* insufficient to show that defendant, who negotiated an exchange of property between the complaining witness and another, entered into any conspiracy to use the mails in connection with a scheme to defraud the complaining witness, or devised a scheme to defraud; it not appearing that defendant, who was guilty of trickery in effecting the exchange agreed upon, combined with others to defraud by use of the mails, or devised a scheme to defraud the complaining witness.

In Error to the District Court of the United States for the Southern Division of the Southern District of California.

Ira H. Stubbs was convicted under count 1 of an indictment charging conspiracy to devise a scheme to defraud by using the mails of the United States (sections 37 and 215 of the Criminal Code of the United States [Comp. St. 1916, §§ 10201, 10385]), and under count 2, which charged violation of section 215, and he brings error.   Reversed, and new trial granted.

Albert H. Elliott, of San Francisco, Cal., for plaintiff in error.

Robert O'Connor, U. S. Atty., and Clyde R. Moody, Asst. U. S. Atty., both of Los Angeles, Cal.

Before GILBERT and HUNT, Circuit Judges, and WOLVERTON, District Judge.

HUNT, Circuit Judge.   The important questions presented are: (1) Was a conspiracy proved? or (2) was it established that there was a scheme to defraud, in the execution of which the mails were used? The first count of the indictment charges that Stubbs, Jones, Margaret Turner, and E. Brown, about August 1, 1915, at Los Angeles, Cal., conspired to use the mails in a scheme and artifice to defraud such persons as would enter into negotiations with the defendants for the purchase, sale, or exchange of real estate pursuant to an advertisement put in the Los Angeles Examiner, a newspaper at Los Angeles.   The scheme charged was substantially as follows:

Defendants advertised that Stubbs had for sale or exchange a bunga-

low and certain lots, and intended that any person who should inquire about the property should be told that the original owner was a railroad man, who had left Los Angeles, and left the matter of selling, exchanging, or transferring to his wife; that his wife was the defendant Margaret Turner, and that she would sell or exchange the property to any inquirer, so as to realize out of it about $2,000; that it was agreed by the defendants that Stubbs would so state to any person inquiring about the bungalow described in their advertisement, and as agent for Margaret Turner would offer to sell and procure title to the bungalow and lots to be conveyed, subject only to a mortgage of $1,450, whereas Margaret Turner was not the owner of the bungalow or lots, and not the wife of a railroad man, or any other man, but was a pretender, to be used by defendants in obtaining conveyance of any title that the proposed purchasers of the bungalow should convey in exchange for the bungalow and lots. It is charged that the intention of the defendants was that by fraud and misrepresentation any inquirer should be led to believe that Margaret Turner was the owner and could convey title, and was to procure the inquirer to pay money offered for the bungalow, and to convey any property offered in exchange therefor to Margaret Turner, and not to convey to any such purchaser of the bungalow and lots any title in exchange for the money or property thus procured to be paid or conveyed to Margaret Turner; that Margaret Turner was thereafter to transfer the property to be conveyed to defendant Jones, and Jones would convey it to defendant Brown.

An overt act charged is that Stubbs, about August 15th, caused an advertisement to be placed in the Los Angeles Examiner, stating that he had for sale or exchange a five-room bungalow, and that the equity for sale or exchange was worth about $2,100. Another overt act charged is that in the office of Stubbs, in Los Angeles, in September, 1915, Stubbs and Jones and Turner had a conference with Mary Abercrombie, and agreed to exchange and transfer the bungalow and lots to her for certain lots at Culver City, Cal., then owned by Mary Abercrombie, and which she agreed to convey to Margaret Turner in consideration of the bungalow and lots and $300 to be paid by Margaret Turner to Mary Abercrombie. Another overt act charged is that Stubbs and other defendants fraudulently obtained possession of a deed executed by Mary Abercrombie preparatory to making the exchange of property, and caused the deed executed by Mary Abercrombie to be put on record in the county recorder's office in Los Angeles county, Cal.

The second count charges that defendants devised a scheme and artifice to defraud Mary Abercrombie and any other persons who might by them be defrauded pursuant to such scheme. It is alleged that they put an advertisement in the Los Angeles Examiner, a newspaper transmitted through the post office, that Stubbs had for sale or exchange the bungalow and lots referred to in count 1. It is not necessary to set forth in detail the substance of this count, inasmuch as it is predicated upon the same facts alleged in the first count. The overt act charged is that on September 11, 1915, the defendants mailed

a letter at Los Angeles, addressed to Mrs. Abercrombie, in Pomona, Cal., wherein defendant Stubbs, as the writer of the letter, among other things, told Mrs. Abercrombie that the parties who owned the $1,200 mortgage are out of the city, and that the "deal" cannot be closed until a later date, when all will be ready.

The evidence of Mrs. Abercrombie is substantially as follows:

About September 1, 1915, in answer to the advertisement concerning the sale or exchange of a bungalow and lots, she saw Stubbs, who told her that the bungalow would rent for about $35 a month and was a very good buy; that the equity was $2,100, with two outstanding mortgages, one for $1,200 and the other for $250. Mrs. Abercrombie told Stubbs that she valued her property at Culver City at from $2,300 to $2,500; that she might exchange for the bungalow, but wanted some cash. Stubbs told her that the parties were in a hurry; that the lady who was there, Mrs. Turner, had come to Los Angeles and bought the cottage after her husband had lost his position in Seattle, but that he had been reinstated and left the property in his wife's hands to dispose of. Mrs. Abercrombie saw the property, but declined to consider the matter unless the house was rented for a year. A few days thereafter it was agreed between Stubbs and Mrs. Abercrombie that she was to give her Culver City lot clear for the equity in the bungalow and $300 cash. A few days later Stubbs telephoned Mrs. Abercrombie that he had leased the property, and asked her to come and sign the contract and "close the deal." She helped to make the contract of exchange which she signed. Stubbs took it, telling her that, when Margaret Turner signed it, he would give her a copy; but he never did. The contract, as recalled by Mrs. Abercrombie, was that Margaret Turner was to give her a deed for the bungalow property clear of all incumbrances, except $1,450, and $300 in cash, in exchange for the Culver City property. Stubbs wanted her to sign a deed that day, but she declined. Stubbs said that Mrs. Turner had not raised the $300, but that he would lend it to her if she did not get it very soon. A few days later Stubbs showed her a check for $300, but said Margaret Turner had not closed the deal; the check was not indorsed. Negotiations not being carried through, Mrs. Abercrombie returned, and later received a letter, dated September 11th, telling her to come in to "close the deal." Mrs. Abercrombie went to Stubbs' office on the 16th and found Margaret Turner there. Stubbs told her that he was not ready to close the deal, but had $25 to advance to her on the deal, and if it was not closed by the 20th that sum would be a forfeit. He asked her to sign the deed for the Culver City property to Mrs. Turner, which was ready and dated September 3d. Mrs. Abercrombie signed it and acknowledged it, was paid $25, but kept the deed, with the understanding that they were to "go into escrow" the next day at the Title Insurance offices.

On September 17th she saw Stubbs in the Title Insurance & Trust Building in Los Angeles, and also met defendant Jones and a Mr. Ogden. Mrs. Abercrombie told Stubbs in that interview that the matter was not being carried out as she understood it, inasmuch as

Stubbs had told her that, if she would bring a certificate of title and leave it with him, he would look up the title without cost, and that his client would do the same with the property he was going to show her, and that, if he could satisfy himself, there need be no money spent for continuing title certificates. Stubbs was to show her a certificate of title held by the man who held the mortgage upon the bungalow, and the certificate was not to be brought down to date by the title company. Stubbs then told Merrill that the $250 incumbrance was past due. Jones said he was "in on this deal, and I am buying your lot, Mrs. Abercrombie, from Mrs. Stubbs, so we can go on and talk it over." Merrill did not like the form of deed, and Jones got a grant form which Merrill liked better. Jones said it made no difference to him, and then said to Merrill, "Why not let Mrs. Abercrombie make this delivery direct to Brown, and not use the bargain and sale form of deed?" Mrs. Abercrombie said she was indifferent as to the grantee, Turner or Brown, provided she got what was due her. Thereupon, at Stubbs' office, Stubbs gave back to Mrs. Abercrombie the deed she had first made, and she put it in her pocketbook, and then made a new deed and went back to the Title Insurance office and "entered into escrow." She then gave both the original deed and the deed to Brown to Merrill. Later she met defendant Jones and told him she did not think she would go on with the deal. Jones told her that he, not Stubbs, was the cause of the delay, and that he thought it was all right for her to go on without a certificate of title; but Mrs. Abercrombie declined to go on unless Margaret Turner signed a statement that there was nothing against the property except the $1,450. Stubbs then telephoned to Margaret Turner and left. Thereafter, at Stubbs' office, Margaret Turner signed a statement that there was nothing against the property but the $1,450, and Mrs. Abercrombie then signed and duly acknowledged a new deed, conveying her property to Brown, and put it in her pocketbook. She then went back to the Title Insurance Company's office and tore the name off the deed which was there.

The witness said that, when in the office of the Title Insurance Company, Mr. Merrill asked her if she was satisfied as to the title of the bungalow. She replied, "No," and claimed the privilege of having certificate of title come through that company, to which Stubbs said, "You will have to pay $7.50 for continuing the abstract;" that she agreed. She then passed both deeds over to Mr. Merrill, and Stubbs handed to Mr. Merrill the Margaret Turner deed. Mrs. Abercrombie designated Mr. Merrill as her agent, with authority to stamp the instrument. Stubbs was to leave the $300 cash due her, and she was to satisfy herself as to the title, and Stubbs was to aid her by lending her the documents. Merrill then laid the Turner deed before her, and put the bargain and sale deed closer to Stubbs. Stubbs picked up the original deed to Turner and said, "This is worthless now," and went through the motions of tearing it up and putting it in the waste paper basket. The next time she saw the deed to Margaret Turner was in the recorder's office, about September 30th; the deed having been put in the recorder's possession with-

out her knowledge or consent. She saw Stubbs again about the 25th of September in his office, and demanded that he reconvey the property included in the Turner deed, to which Stubbs replied, "They accepted it." A few days before this Stubbs had told her that he would give her a $5,000 bond assuring the title to the property, but she had replied, "No," that she wanted a certificate through the Title Insurance Company. About September 21st Jones telephoned her to the effect that by her request for a certificate of title the deal had been tied up, and wanted to know if there was anything he could do to further the matter, and Mrs. Abercrombie replied, "No." Mrs. Abercrombie and Jones had a talk in the presence of Stubbs, and she charged him with complicity with Stubbs in defrauding her of her property. Jones said that he came in to buy a lot and did not know anything about it. After some accusations she consulted her counsel, and told him that according to the record W. L. Moody owned the bungalow and lot (15 Bittle Tract). Mrs. Abercrombie's attorney then gave Jones and Stubbs until Monday to make a reconveyance of the Culver City property. Stubbs admitted that he ought not to have taken the deed, and was sorry that he had recorded it, and said he thought Brown would deed the property back, and that Jones had a deed from Brown, conveying the property back to her, but that it was not properly acknowledged. Thereafter Mrs. Abercrombie received her deed to Brown from the Title Insurance & Trust Company and tore it up.

On cross-examination Mrs. Abercrombie said she was perfectly satisfied if all the stipulations were lived up to, and that the $300 "boot money" was deposited on the 29th; that she had written to Stubbs on the 27th of September, telling him that she did not want to go through with her contract, and that before that date she knew that Stubbs had sold the lot he was getting from her for Mrs. Turner to a Mr. Brown through the real estate agent, Jones; that she made no objection, provided they did what they agreed to do; that she did not deliver to Stubbs a bargain and sale deed, and did not receive from him a deed executed by Margaret Turner; that the two deeds were on the table when Mr. Merrill was present, and that Stubbs told her she could take the deed and satisfy herself as to the title; that on the next day she took it back and offered it to Merrell, who told her to send it to Stubbs, but that she did not do so, and turned it over to the Title Insurance Company on the 24th of September. She says that on the 17th of September she had a talk with Stubbs and Jones and Merrill, when Merrill placed the bargain and sale deed in front of Stubbs and the Turner deed in front of her, and she signed an escrow instruction, which was put in the Title Insurance & Trust Company, regarding the Culver City lot to Brown, but does not remember that the instruction called for a payment to her of the sum of $275; that Stubbs paid her $25 as part of the payment of $300, and that she was to receive $275 through escrow; that her main object was to get the $300, and that she was satisfied with the property she was to get from Margaret Turner in exchange for her property.

George Stelle, called by the government, testified that he was employed in the escrow department of the Title Insurance & Trust Company of Los Angeles, and had charge of the escrow between Mrs. Abercrombie and Stubbs; that on September 22, 1915, the company delivered to Stubbs the certificate of title to the Culver City lot, and he receipted for it, and on September 29th $275 was deposited by Mr. Clanton to the credit of Mrs. Abercrombie on the escrow involving the exchange of properties between Margaret Turner and Mrs. Abercrombie. Clanton testified that he had made the $275 deposit in the interest of Mr. Jones, and deposited it with instructions to the Title Insurance & Trust Company to pay the same to Mrs. Abercrombie.

C. L. Brewer testified that in September, 1915, he was employed by the Los Angeles Title Insurance Company; that he had an escrow dated September 22, 1915, to which Stubbs and Jones were related. This escrow was signed by Jones, and called for $635 to be used for guaranty of title for lot 10, block 19, tract 2444, Culver City property, to show title vested in A. W. Brown. Brewer further said that, when Stubbs and Jones left the escrow, they handed to him the deed from Mrs. Abercrombie to Margaret Turner, and on the same day Stubbs advised the witness to deliver the deed to Miss Betty Richards; that thereafter they received a deed from Margaret Turner to Brown, which was used in place of the prior deed, owing to a defect in the power of attorney in the first deed; that the $641 cash placed in escrow by Jones was on hand; that papers were signed for recording and the money disbursed on the 25th; that a check was delivered in favor of Nellie Stubbs for $1,615.50. The deed, which was part of the escrow from Turner to Brown, was signed by Stubbs, as attorney in fact for Margaret Turner. This deed, as stated, was not used, because of a defect in the power of attorney. In the deed, Margaret Turner, described as a single woman, granted to A. W. Brown, a single man, lot 10, block 19, tract 2444, etc.

Albert Chapelle, an employé of the district attorney's office in Los Angeles county, testified that he had a talk with Stubbs about October 2, 1915, concerning the transaction between Stubbs and Mrs. Abercrombie; that Stubbs said he had received the deed from Mrs. Abercrombie to Margaret Turner, and that it had been put in escrow with the Title Insurance & Trust Company; that Jones objected to the deed, whereupon it had been arranged between Jones, acting for Brown, Mrs. Abercrombie, and himself that this deed should be withdrawn, and a deed directly from Mrs. Abercrombie to Brown should be substituted for it in escrow at the Title Insurance & Trust Company; that Stubbs said he had recorded the deed because Jones was pushing him to close the transaction and that the deal would be lost if the matter was not hurried up.

On the part of the defendants one witness was called, Baker, who said that he had a lien on the property located at 1307 Myra street (evidently the Margaret Turner lots), a trust deed, which he had since foreclosed, and when foreclosed, in May, 1916, that he served parties by the names of Moody, Abercrombie, and Turner with notice of foreclosure.

We cannot gather from all this evidence substantial proof of a conspiracy (section 37, 35 Stat. 1096) to commit a violation of section 215 of the Criminal Code, or of a violation of section 215. The advertisement was not a misrepresentation. Stubbs had the property for exchange, and Mrs. Abercrombie, who is evidently a very intelligent and capable woman, examined it and then concluded it was worth the price set upon it by Stubbs, and advised Stubbs that she was ready to make the exchange if her terms were complied with. There was no evidence to sustain the charge in the indictment that Stubbs or any one else told Mrs. Abercrombie that the original owner of the property was a railroad man and the husband of Mrs. Turner, or that Mrs. Turner wanted to realize about $2,000 from the property. In the preliminaries, certainly, Mrs. Abercrombie was not misled in any way, but, on the contrary, was perfectly satisfied to make the exchange. There appears to have been no unfairness in the matter of values, and no evidence of any criminal combination between Stubbs and Mrs. Turner or Jones in any of the preliminary talks, relating to the sale or exchange of the property. It may be that there was some cause for suspicion in the statements made by Stubbs in excusing himself for delay in not procuring the $300 from Mrs. Turner; but, assuming there was, still there is lack of evidence of any concert of action between Stubbs and any one with intent to devise a scheme to defraud and to defraud by using the mails.

The evidence shows that Mrs. Turner owned the property, subject to two mortgages, amounting to $1,450. If, as a fact, at the time of the negotiations or execution of the papers, Mrs. Turner was not the owner, the prosecution could have easily proved the state of title; and, if it were not in Mrs. Turner, a strong case against the defendant would have been made. But in the absence of such evidence the presumption of innocence stands in defendant's favor. Again, there was the payment of $25 to Mrs. Abercrombie, which was accepted by her after statements by Stubbs of the inability of Mrs. Turner to make the further payment until a later date, and the evidence of the prosecution is that at a later date the $275 was deposited for the credit of Mrs. Abercrombie. There was, on Mrs. Abercrombie's part, dissatisfaction over the evidence of title to the Turner property and some parleying between her and Stubbs; but the conversations constituted no sufficient evidence of conspiracy to defraud between Stubbs and any one else.

Coming now to the fact that there was a third person interested, we find that Mrs. Abercrombie was told, in the presence of Mr. Merrill, of the Title Insurance & Trust Company, that there was another person interested; but she frankly says that she made no objections "as to the deal being a three-cornered one," and that it was satisfactory if they did what they stipulated to.

The connection of Jones with the transaction is also important. The indictment charges that Margaret Turner would cause the lots to be conveyed by the purchaser to Jones, and that Jones would thereafter convey or cause the lots to be conveyed to Brown, as part of the fraudulent scheme. But, as it was explained to Mrs. Abercrombie before

she concluded the transaction that Jones was not the real buyer, and that Brown was to be the purchaser of the property, and as Mrs. Abercrombie was "perfectly satisfied," provided she received the $300 agreed to be paid to her, we cannot see how it can be said that there was proof, beyond a reasonable doubt, of a combination between Stubbs and Jones, or Brown or Turner, with purpose to defraud. The transaction was, as explained by Mrs. Abercrombie, a "three-cornered deal." She said:

"I knew * * * that he [Stubbs] sold the lot he was getting from me for Mrs. Turner to a Mr. Brown through the real estate agent named Jones. I knew Mr. Jones expected to get my Culver City lot from Mr. Stubbs."

Furthermore, the transaction was carried through in the office of an escrow agent, the Title Insurance & Trust Company. It comes, then, to this: If there was a conspiracy to defraud, as charged, or a scheme devised, it must have been in relation to what happened on the 17th of September, when Mrs. Abercrombie and Stubbs and a Mr. Ogden met in the Title Insurance & Trust Company Building in Los Angeles. There the matter of the exchange was talked over between Stubbs and Mr. Merrill. Jones said he was buying the lot from Stubbs, and that it made no difference to him what form of deed was used. Mr. Merrill objected to one form, and Jones suggested that Mrs. Abercrombie could make delivery direct to Brown, who appears to have been exchanging an equity in some acreage for a lot in Culver City, which was the lot Mrs. Abercrombie was conveying to Margaret Turner. But Mrs. Abercrombie distinctly says that she was asked by Mr. Merrill if she was willing to deed directly to Brown, and replied that she was, if she got what was agreed to be paid to her; that she did not care who got the property, and would deed to Brown, or Margaret Turner, "whichever one you all decide on, if I get what is due me." The only reason, apparently, why the deeds were not made then and there was the desire to save the expense of having them made out by the Title Insurance Company. Mr. Merrill at that time gave to Mrs. Abercrombie the deed she had made to Margaret Turner. New deeds were made and put in escrow in the Title Insurance office, Mrs. Abercrombie also giving to Mr. Merrill the original deed. Again, thereafter, Mrs. Abercrombie went over the whole transaction with Jones.

There remains the circumstance of the action of Stubbs in going through "the motion of tearing up the original deed" in the presence of Mr. Merrill and Mrs. Abercrombie. It is not contended that Stubbs did destroy the deed; his fault was in allowing Mrs. Abercrombie to think he had destroyed it, and in putting the deed upon record and not frankly telling Mrs. Abercrombie the whole truth, or making known to her or to Mr. Merrill what his purpose was. Of course, Stubbs was wrong in this, and afterwards admitted his error. But, after all, the material question for decision is whether he was one of a conspiracy to devise a scheme to defraud by using the mails of the United States; and, granting that his conduct in and about the recording of the deed was deception, nevertheless, if there is no evidence of conspiracy or of a scheme to defraud and use of the mails,

the conviction of the charges against him cannot stand. Farmer v. United States, 223 Fed. 903, 139 C. C. A. 341.

It is to be emphasized that the contract of exchange between the parties called for certain things, which were done. There was a deed to the Turner property, subject to a total secured indebtedness of $1,224, delivered to Mrs. Abercrombie through the escrow agent. Mrs. Abercrombie was to be paid $300 by Margaret Turner; $25 was paid to her at the signing of the contract, and the balance was delivered to the escrow agent for her. Before she transferred to Brown, she knew that there was a third party, Brown, in the matter, and made no objection whatsoever. Mrs. Abercrombie was not injured by the recording of the deed, and assuming that there was chicane on the part of the defendant Stubbs in not telling her of his purpose, and in having the deed recorded, it does not prove that he was in fraudulent combination with Jones, or Brown, or Margaret Turner, or that he had devised a scheme to defraud any one, and in carrying it out used the mails, as charged in the first and second count of the indictment. The explanation of counsel for Stubbs is that Stubbs feared Mrs. Abercrombie would try to get out of her contract, and, as he was bound in the three-cornered deal to sell, his possession of the deed was a kind of guaranty that Mrs. Abercrombie would stand by her bargain, and that Stubbs expected to get the balance of the $300 wherewith to pay Mrs. Abercrombie out of the sale to Brown, to whom she made the deed already referred to. This may or may not be correct, but it is compatible with innocence of alleged criminality. It is to be remembered that the Turner deed to Mrs. Abercrombie had already been delivered to the escrow agent by Stubbs, and the $25 of the $300 had been paid. Stubbs should have acted with candor and waited; but, confining our opinion to the evidence of the charge made against him, we cannot deduce the criminality alleged by reason of the fact that he kept the first deed and put in on record, or wrote the letter of September 11th to Mrs. Abercrombie. Trickiness of method in carrying out the agreed-upon exchange is not to be confused with a scheme to defraud as charged.

Judgment is reversed, and a new trial granted.