## LUCADAMO et al. v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit. February 14, 1922.)

No. 165.

1. **Conspiracy ⬦═37—Not merged in completed offense.**
   The crime of conspiracy to commit an offense is not merged in the completed offense.

2. **Conspiracy ⬦═40—Mere acquiescence in unlawful act not sufficient to constitute.**
   The mere knowledge, acquiescence, or approval of an unlawful act, without co-operation or agreement to co-operate, is not sufficient to constitute one a party to a conspiracy to commit the act.

3. **Conspiracy ⬦═47—Conviction held sustained by evidence.**
   A conviction of conspiracy to commit an offense *held* sustained by evidence showing that each defendant intentionally participated in the attempt to commit the offense.

4. **Criminal law ⬦═37—Purchase of drugs by government agents held not entrapment.**
   The fact that government agents, who suspected defendants of dealing in prohibited drugs, went to them as purchasers, and after negotiations

purchased morphine from them, *held* not an entrapment, which invalidated defendants' conviction.

5. **Criminal law** ⊂⟶1186(4)—**Error in instruction held harmless.**
Error in refusal of a requested instruction *held* not ground for reversal, under Judicial Code, § 269, as amended by Act Feb. 26, 1919 (Comp. St. Ann. Supp. 1919, § 1246), prohibiting reversal for technical errors, where the guilt of defendants was clearly established.

In Error to the District Court of the United States for the Eastern District of New York.

Criminal prosecution by the United States against Vincent Lucadamo and others. Judgment of conviction, and defendants bring error. Affirmed. ·

Charles J. Buchner, of Brooklyn, N. Y., for plaintiffs in error Lucadamo and Damato.

Nash & Gottesman, of Brooklyn, N. Y. (Howard P. Nash and Sidney M. Gottesman, both of Brooklyn, N. Y., of counsel), for plaintiff in error D'Ambrosia.

Wallace E. J. Collins, U. S. Atty., of Jamaica,· N. Y. (Henry J. Walsh, Asst. U. S. Atty., of Brooklyn, N. Y., of counsel), for the United States.

Before HOUGH, MANTON, and MAYER, Circuit Judges.

MANTON, Circuit Judge. By this indictment, the defendants below were charged with violation of section 37 of the United States Criminal Code (Comp. St. § 10201). In substance, the charge is that they unlawfully, willfully, and knowingly conspired and agreed together and with other persons to commit an offense against the United States; that is, to violate the Act of December 17, 1914, as amended by sections 1006–1008 of the Revenue Act of 1918 (Comp. St. Ann. Supp. 1919, §§ 6287g, 6287*l*, 6287r), in that they unlawfully sold and caused to be sold to one Milton Moffet 15 ounces of morphine, a derivative of opium. Four overt acts are charged in furtherance of the· conspiracy: First, that the defendant Damato introduced Moffet, Spellman, and Meisenzahl to John Lavelle, for the purpose of bringing about a sale to Moffet; second, that John Lavelle introduced Spellman and Meisenzahl to Lucadamo and D'Ambrosia for the purpose· of bringing about the sale; third, that the defendants below, Damato and Lucadamo, delivered the morphine to Moffet; fourth, that Lucadamo accepted from Moffet $300 for the morphine obtained by Moffet from Lucadamo and Damato. While writs of error were sued out by each of the defendants below, upon this appeal John and Gaetano Lavelle are not represented by counsel. Moffet and Meisenzahl were· policemen, and Spellman was a drug addict. They were all engaged in detecting traffic of morphine and other drugs.

The defendants below urge here that the court below erred in denying their respective motions to dismiss the indictment or direct a verdict of acquittal, and this .upon the ground that the evidence was. insufficient to submit to the jury on the question of conspiracy to vio-

late the federal Criminal Code. It will be necessary, therefore, to examine briefly the testimony adduced on behalf of the government.

Moffet testified that he used Spellman as an investigator, and with his fellow policeman, Meisenzahl, went to Hudson avenue, near Johnson street, in the borough of Brooklyn, city of New York, and there met Damato through the introduction of Spellman. Damato invited Moffet to go with him to a poolroom at No. 57 Flatbush Avenue Extension, where they were introduced to John Lavelle. Damato explained to Lavelle that Moffet, Meisenzahl, and Spellman were "going to buy the stuff." Lavelle stated that he had given "the stuff to another fellow to peddle in Williamsburg," but that he thought he could get hold of the fellow, and told them to wait in the poolroom until he and Damato returned. About an hour later, Lavelle came back alone and said everything was all right, and that they would hear from them in about 10 minutes. Lavelle left and came back, and said that Damato was on the telephone, and had asked for Dinny (meaning Spellman), and wanted Moffet to come right down. Moffet waited at the poolroom, but John Lavelle, Meisenzahl, and Spellman left the room. Then Gaetano Lavelle went over to Moffet and said, "We got some good stuff," and "We handle good stuff." He took out of his right-hand shirt pocket a sample of white powder, which he showed to Moffet, and took Moffet to his own room upstairs. Moffet returned to the poolroom and remained there until Meisenzahl, Spellman, John Lavelle, and Damato returned. Moffet then said he didn't see "why they couldn't make the sale there," as they had promised, and they replied that "the fellow didn't want to bring it there." Moffet agreed to go with them. John Lavelle told Gaetano Lavelle to "mind the poolroom." John Lavelle and Damato left the poolroom with Moffet, Meisenzahl, and Spellman. They went to the corner of Concord and Hudson avenues, where they met Lucadamo and D'Ambrosia. Lucadamo said he could not bring them all up to his sister's house, but that he would take only Spellman and Moffet. Later he agreed to let Moffet and Spellman and Meisenzahl come up to the house, and he requested D'Ambrosia and Lavelle to wait on the corner. However, D'Ambrosia followed up to the door, where Lucadamo again told him to remain downstairs. Lucadamo went into a room and brought out a cigar box filled with white powder. A dispute about the price ensued. Moffet stated that he understood from Spellman the price to be $15 an ounce. Lucadamo said Spellman told him $20 an ounce. Moffet said the price would not make any difference, but that he had brought $300, and he wanted Lucadamo to save all over the 15 ounces, as he would be back for it on the next day. The powder was weighed, and 15 ounces were poured out in the box that Spellman had. The box was wrapped in a newspaper and Moffet handed Lucadamo $300, which the latter counted. In the meantime Spellman left with the powder at Moffet's direction. After Lucadamo had counted the money, Moffet said he had given him $10 too much. Then Lucadamo took it from him to count it again, and, while counting it, three police officers came into the room and took the money out of Lucadamo's hands, and, after comparing the marks on the money with the slip in the hand of one of the officers, Dama-

to and Lucadamo were arrested. While they were in the room, D'Ambrosia came in, and he was arrested. Later John Lavelle was arrested.

Spellman, who said he was a reformed drug addict, corroborated this testimony in substance. He said that, when the three were introduced to Lucadamo and D'Ambrosia, D'Ambrosia said, "Who has got the money?" Meisenzahl testified in corroboration, and further stated that, when Spellman and he left the poolroom and left Moffet behind, Lavelle went to the telephone and returned, saying that Damato wanted to see Spellman. Lavelle took them to another poolroom on Navy street and Park avenue; that Lavelle went inside, later coming back, and said that Damato would be right out, whereupon D'Ambrosia and Lucadamo came along, and Spellman and Meisenzahl were introduced to them. Lucadamo asked, Who had the money? and Spellman said Moffet had it. Lucadamo said, "Let us return to the poolroom and get the officer with the money," but later said he did not use the word "officer," because he did not know Moffet was an officer.

From the above, it is apparent that all of the defendants named were engaged in a conspiracy to violate the sections of the Revenue Act referred to. Damato and Lucadamo were the first to appear on the scene and introduce the two policemen, together with Spellman, to John Lavelle, with the statement that they were the men who were the buyers. After this, they proceeded to aid in and facilitate the sale of the prohibited drug. It was Damato who returned, after leaving with the officers to go to the place where the drug was to be obtained, and reported that it was necessary to take the policeman to the place where they met Lucadamo and D'Ambrosia. Lucadamo and D'Ambrosia went upstairs to Lucadamo's sister's rooms, and the bargain for the sale of the morphine was there effected and the money was passed. D'Ambrosia, after having been formally introduced, became a member of the party of sellers of the morphine, and when at the corner of Concord street and Hudson avenue asked, "Who has got the money?" He was insistent upon going upstairs with his co-conspirators, where the morphine was to be obtained, and remained downstairs only after Damato told him to do so, and then he and Lavelle waited on the corner. He waited around for a period of about an hour, during which time he was watched by other policemen, who were working with Moffet. He later walked into the place where the sale of morphine had taken place, and where the arrests of Damato and Lucadamo were made. The evidence is clear that the two Lavelles joined in the conspiracy and took an important part in it.

[1] A conspiracy to commit a crime is a different offense than the crime that is the object of the conspiracy, and it is punishable, though the attempted crime be accomplished. If the substantive offense of violation of the statute of selling were charged here, the evidence was sufficient to warrant the submission to the jury, and the fact that conspiracy to commit the crime is charged, instead of the intended crime, requires only that the conspiracy and some one overt act in furtherance of the conspiracy be proven. The conspiracy is not merged in the completed offense. The elements of the crime are: First, an object to be accomplished, which must be, in this instance, the

commission of an offense against the United States; second, an agreement or understanding between two or more persons, whereby they become committed to co-operate for the accomplishment of the object by means embodied in the scheme or by any effectual means, and a plan or scheme embodying means to accomplish the object; third, an overt act by one or more of the conspirators to effect the object of the conspiracy. It was sufficient to submit the evidence to the jury, since it appeared that the jury might find that the minds of the parties met understandingly, so as to bring about an intelligent and deliberate agreement to do the acts and to commit the offense charged. A defendant can be guilty of committing an offense, by consenting thereto, only where his consent is of that affirmative and express character which amounts to counseling, aiding, and abetting in the commission of the offense. Woo Wai v. United States, 223 Fed. 412, 137 C. C. A. 604.

[2, 3] Unless the scheme, or some proposed scheme, is in fact consented to or concurred in by the parties in some manner, so that their minds met for the accomplishment of the proposed unlawful act, there is no conspiracy. United States v. Cole (D. C.) 153 Fed. 803. So the mere knowledge, acquiescence, or approval of the act, without co-operation or agreement to co-operate, is not enough to constitute a party to a conspiracy. Patterson v. United States, 222 Fed. 599, 138 C. C. A. 123. To constitute a conspiracy, the evidence must show an intentional participation in the attempt to commit the offense. Marrash v. United States, 168 Fed. 225, 93 C. C. A. 511. When, as here, the evidence shows that the several defendants acted illegally with the same end in view, to wit, selling the morphine, and each performed some acts pursuant to the mutual understanding and agreement, the crime is complete. Mere presence on the occasion of the conspiracy is not sufficient to make one guilty. The person charged must incite, procure, or encourage the act, and if a person joins a conspiracy at any time after it is formed, he becomes a conspirator. So, if any of the defendants below joined the conspiracy any time after it was formed, he became a conspirator, and the acts of the others became his by adoption. Of course, one of the defendants below, not a party to the conspiracy, could not be convicted on an overt act.

It was not error to refuse to strike out the conversation of the witness Moffet with Lavelle at the poolroom in the absence of Damato. It is plain that the evidence warranted the claim of the government that at this time a conspiracy had originated, and all of the defendants below had become parties to it, and it was not terminated at the time of this conversation.

[4] It is urged on behalf of the defendants below that there was an entrapment by the agents of the government. It is unlawful for a public official or any person to induce a man to commit a crime in order to obtain a conviction. The courts have refused to lend aid or encouragement to officers who may, even under a mistaken sense of duty, encourage or assist parties to commit crime, in order that they may arrest and then punish them for so doing. So, where a scheme does not originate with a defendant, and he is lured into the conspiracy by an officer of the law, he cannot be held for the offense, for in the con-

280 F.—42

templation of law no crime has been committed. Woo Wai v. United States, 223 Fed. 412, 137 C. C. A. 604; Butts v. United States (C. C. A.) 273 Fed. 35; United States v. Lynch (D. C.) 256 Fed. 983. But the evidence here indicates that the government agents suspected and knew that the defendants below were trafficking in drugs, and the government agents bargained with them for the sale of such drugs. This the defendants below were perfectly willing to do for apparent profit. They had the drugs, or knew where to get them, and wanted to sell them. No representations were made to them of any kind. They treated the officers of the law as if they were but ordinary purchasers. Under these circumstances, they cannot be heard to complain of entrapment, and escape from their unlawful intent to violate the law. Grimm v. United States, 156 U. S. 604, 15 Sup. Ct. 470, 39 L. Ed. 550; Goode v. United States, 159 U. S. 663, 16 Sup. Ct. 136, 40 L. Ed. 297.

[5] The court was asked to charge the jury that the mere presence of any of the defendants below in or near the scene of the alleged transaction was simply a circumstance, from which they cannot infer that the crime of conspiracy was committed. In denying this request, the court charged:

"Well, I will not charge that they cannot infer it, because the circumstance is to be taken into account, and be given such weight as they find that as evidence in the case it should be given."

Abstractly, the defendants below were entitled to have charged their request. The response of the court to this request, in the language employed, did not correctly state the rule of law. But the case is not close, for the guilt of the defendants below is clear. The error is one which does not require reversal, and where harmless error is the subject of an exception, as is quite clearly shown from the record, the commission of an error is not cause for reversal. Crawford v. U. S., 212 U. S. 183, 29 Sup. Ct. 260, 53 L. Ed. 465, 15 Ann. Cas. 392. It is provided by section 269 of the Judicial Code (Comp. St. Ann. Supp. 1919, § 1246) that, on the hearing of an appeal, certiorari, writ of error, or motion for a new trial in any case, civil or criminal, the court shall give judgment after examination of the entire record before the court, without regard to technical errors, defects, or exceptions which do not affect the substantial rights of the parties. Invoking this rule, we think that there was no error which requires our reversal of this judgment.

Judgment affirmed.