## DICKERSON et al. v. UNITED STATES.

Circuit Court of Appeals, Eighth Circuit. April 9, 1927.

No. 7458.

1. Conspiracy ⟨⟨⟩⟩47—In prosecution for conspiracy to traffic in liquor, evidence showing only particular defendants' purchase from original conspirators without knowledge of conspiracy held insufficient to sustain their conviction.

In prosecution for conspiracy to transport, sell, and possess intoxicating liquor, evidence showing only that particular defendants purchased liquor from original conspirators without knowledge of its source, or of the conspiracy, held insufficient to sustain conviction of such defendants.

2. Criminal law ⟨⟨⟩⟩308—Evidence susceptible of two inferences, one favorable to innocence, is robbed of probative value.

Whenever a circumstance relied on as evidence of criminal guilt is susceptible of two inferences, one of which is in favor of innocence, such circumstance is robbed of all probative value, even though from other inferences guilt may be fairly deducible.

3. Conspiracy ⟨⟨⟩⟩23—Proof of conspiracy to violate statute requires evidence of more than participation in substantive offense, namely, unlawful agreement and participation with knowledge thereof.

To warrant conviction for conspiracy to violate a criminal statute, the evidence must disclose something further than participation in the offense which is the object of the conspiracy, and must establish an unlawful agreement express or implied and participation with knowledge thereof.

4. Intoxicating liquors ⟨⟨⟩⟩236(6½)—Evidence held to sustain conviction for unlawful possession of liquor.

Evidence held to sustain conviction for unlawfully possessing liquor.

In Error to the District Court of the United States for the Southern District of Iowa; Andrew Miller, Judge.

James Dickerson and others were convicted of conspiracy and of unlawfully possessing intoxicating liquor, and they bring error. Convictions for conspiracy reversed, and convictions for unlawful possession affirmed.

C. C. Putnam, of Des Moines, Iowa (Walter Maley, Paul Williams, and Wilson & Shaw, all of Des Moines, Iowa, on the brief), for plaintiffs in error.

Ross R. Mowry, U. S. Atty., of Newton, Iowa (Frank Wilson and Ray C. Fountain, Asst. U. S. Attys., of Des Moines, Iowa, on the brief), for the United States.

Before KENYON, Circuit Judge, and SYMES and MOLYNEAUX, District Judges.

MOLYNEAUX, District Judge. The four plaintiffs in error, Dickerson, Conroy, Halley, and Eaton, were indicted together with fifteen other individuals and one corporation, charging conspiracy and various violations of the Prohibition Act (Comp. St. § 10138¼ et seq.). There were five counts in the indictment, and plaintiffs in error were convicted on the first and fourth counts.

The first count charged all of the defendants with a conspiracy (a) to transport 70

drums of alcohol from Peoria, Ill., to Des Moines, Iowa; (b) to sell intoxicating liquor in Des Moines at the Red Line Transfer & Storage Company; (c) to have and to hold intoxicating liquor in their possession for beverage purposes in the city of Des Moines; (d) to possess intoxicating liquor for unlawful purposes in the city of Des Moines; (e) to transport intoxicating liquor in the city of Des Moines; (f) to unlawfully possess intoxicating liquor in the county of Polk and state of Iowa. The fourth count charged the plaintiffs in error with the misdemeanor of unlawfully possessing intoxicating liquor in Des Moines.

The plan to purchase from the Kentucky Distilleries & Warehouse Company, of Peoria, Ill., 70 drums of alcohol and transfer it by railroad to Des Moines, Iowa, and there sell it, was conceived and carried out by a group of Des Moines business men in conjunction with some of the officers and employés of the Kentucky Distilleries & Warehouse Company, aided by certain other persons connected with the railroad and the Red Line Storage Company in Des Moines, and certain other persons who joined with the conspirators to help them sell the liquor, after it arrived in Des Moines. The corporation indicted was the Kentucky Distilleries & Warehouse Company, of Peoria, Ill.

Brown, Brauer, Fuhrman, McKiernan, and Kruger were five of the defendants indicted under the conspiracy charge, each being a resident of Peoria, Ill., and were respectively the manager, assistant manager, superintendent, assistant superintendent, and foreman of the aforesaid corporation. Breckenridge, another defendant charged with conspiracy, was the United States government gauger residing in Peoria, Ill. Lipkin and Ballance, two other defendants under the same indictment, were residents of Peoria, Ill. Hunnell, one of the defendants charged with conspiracy, was a wholesale druggist in Des Moines. Schaller, another defendant, was a hotel keeper of Des Moines, and was formerly connected with Hunnell in the wholesale drug business. Chapman, another defendant under the same indictment, was a druggist residing in Des Moines, Iowa, and an acquaintance of Hunnell's. Levey, another defendant, charged with the conspiracy, resided in Des Moines, Iowa, and was an acquaintance of Hunnell.

The balance of the defendants are the four plaintiffs in error and Masters and Olson, who do not appear in this court upon writ of error, and Neal Brady, a druggist, the indictment against whom was quashed in

the court below. Each of these last named defendants and plaintiffs in error being residents of Des Moines, Iowa.

The trial of the case began on December first.

On December 7, 1925, the seventh day of the trial, Ballance, Lipkin and McKiernan, all of Peoria, Ill., and Hunnell, Schaller, and Levey withdrew their pleas of not guilty and pleaded guilty to count 1 of the indictment, that being the conspiracy count, and as to them the government nolled counts 2, 3, 4, and 5. The indictment was dismissed as to Fred Chapman, a local druggist of Des Moines, upon his plea in bar that he had testified for the government in obedience to a subpœna.

The trial thereupon continued as to Dickerson, Halley, Conroy, and Eaton, each of whom were found guilty on counts 1 and 4. Dickerson, Halley, and Eaton were sentenced to imprisonment in the federal penitentiary, each for a term of 16 months on count 1, and each were fined $100 under count 4. Conroy was sentenced to Polk county jail for a period of six months under count 1 and fined $100 under count 4.

The defense asserted by each of the four plaintiffs in error to count 1 was that they were not a party to the conspiracy in any respect; that each of them merely purchased liquor in Des Moines from the conspirators, after the liquor had been transported and had been held in Des Moines for some time, and without knowledge on their part of the conspiracy. Their defense to the fourth count is that there is no evidence showing possession of liquor by them.

The indictment charged a continuous conspiracy from the 25th day of February, 1923, to on or about the 25th day of March, 1923. A careful examination of the evidence discloses the facts to be as follows:

Dorsey Hunnell, a wholesale druggist at Des Moines, Iowa, met an acquaintance, defendant Levey, in Des Moines in January, 1923. This was the beginning of the conspiracy. Levey told Hunnell that he had a connection where he could get a carload of alcohol that was to be labeled denatured alcohol. There would be a few drums of denatured alcohol in the car, and the balance of it would be pure alcohol. Levey said they would have to pay $6 a gallon for the pure alcohol. On the same day Hunnell saw Schaller, the proprietor of the Martin Hotel in Des Moines, Iowa, and Schaller said he thought he had a man that could handle the deal. In the early part of February, thereafter, Schaller, Levey, and Hunnell, of Des

Moines, and Lipkin, of Peoria, Ill., met at the Martin Hotel and consulted over the matter. Thereafter on the 20th day of February, Hunnell and Schaller met again at the Martin Hotel in Des Moines and consulted over the matter. No one else was present at this meeting.

Again the very last of February, Schaller, Hunnell, and Levey met at the Rock Island depot in Des Moines, and left for Peoria, arriving there on the 27th of February. There they met Mr. Lipkin, of Peoria, and went down to see Ballance, who was a resident of Peoria, and then met with McKiernan, who was employed at the Kentucky Distilleries & Warehouse Company in Peoria. At that time they worked out the name of a fictitious concern, the Acme Oil & Supply Company, and arranged to have 80 drums of alcohol shipped to the fictitious company at Des Moines. The first five numbers and the last five numbers of the drums numbered serially were to be denatured alcohol, and the intervening numbers would be pure alcohol. The alcohol was to be shipped with a bill of lading attached, and stored in the Red Line Transfer Company at Des Moines. At this conference Ballance explained the plans for getting the alcohol out of the distillery through men that were in the distillery.

After their return to Des Moines, the alcohol was shipped and Mr. Schaller took up the sight draft, so as to get possession of the bill of lading. Mr. Schaller then turned the bill of lading over to Mr. Berg, of the Red Line Transfer Company. Hunnell had a good many conversations with Berg about the matter. The bill of lading was delivered to Berg about the 7th of March, 1923. Schaller and Hunnell delivered to Berg this bill of lading, and Berg paid the freight at the time the car was received from the Rock Island Railroad Company; Schaller giving Berg a check for the freight.

Berg then unloaded the alcohol at the warehouse, and then informed Hunnell and Schaller that he had it unloaded in the warehouse basement, and they both went down and looked it over, and said they would get it out in a very short time. The next morning Hunnell told Berg that he was going to have the alcohol sent back, and asked that Berg order a car for that purpose.

The next morning Hunnell called Berg and said to him not to mind, but to cancel the order for the car; that they were going to take it out right away. Hunnell then told Berg that he was done with this matter, and was washing his hands of it, and would have nothing more to do with it. Hunnell and

Schaller gave to Berg the serial numbers of the 10 denatured drums. These drums were in the possession of Berg at the time of the trial.

Around the 3d, 4th, or 5th of March, Schaller told Hunnell that he had taken out 2 drums, and that a man by the name of Alexander was taking the stuff out as fast as he could. Schaller kept telling Hunnell that this man Alexander, who was not a defendant, and whom no one seemed to know other than Schaller, was unloading the stuff and taking it out, but Hunnell became suspicious and called upon Berg, when Schaller told him that he already had half of it out, and Mr. Berg told Hunnell that only 2 drums had so far been taken out, and that they were taken out the evening or the night of the first day the car was set at the warehouse.

Around the 4th of March one of the plaintiffs in error, Eaton, asked Berg if he had a carload of alcohol in the warehouse. Berg told him that he did. Eaton then wanted to know if he could get a couple of drums. Berg told him he would have to call upon Schaller and see. He called up Schaller, and told him that Eaton would like to have 2 drums, and Schaller said all right; let him have them for $1,000. Berg did this, and Eaton paid Berg for the alcohol by check.

Hunnell lost faith in Schaller's ability to move any of the alcohol, and went out to see if he could unload it himself. He first went to the defendant Chapman's drug store. Chapman was not there, and Hunnell then went to see another druggist, and one of the defendants in the court below, Neal Brady. Brady refused to buy, but said he had a friend that might take some of it. All Hunnell told Brady was that he had a quantity of pure alcohol and could let him have any amount that he wanted.

Brady afterward called Hunnell over the phone and told him that his friend would like to get 8 drums and asked him how much it would be and Hunnell told him it would be $3,190. He later called Hunnell again and said that his friend wanted to get those 8 drums. This was around about the 10th of March, 1923. And on the same day Brady came to Hunnell's office in the Des Moines Drug Company and with him was one of the plaintiffs in error, Mr. Halley. Hunnell did not know Halley, and Brady introduced Halley to him.

At that time the plaintiff in error Halley did not know where the goods were and he had to ask Hunnell. Hunnell told him that they were at the Red Line Transfer & Storage Company. Halley then gave Hunnell a

check for $3,190. When Hunnell had the conversation with Brady, he did not tell him either how he had secured this alcohol or where it had come from or any other thing than that it was there for sale—did not convey any knowledge to him about those matters. This cashier's check which Halley gave to Hunnell was dated March 13, 1923. Hunnell then called Mr. Berg over the telephone and told him to deliver 8 drums to Halley. He told Berg to get the alcohol out of the basement to a door, where it could be loaded upon a conveyance and to give it to Halley.

Schaller kept telling Hunnell that he might sell some to this fellow and some to that fellow, until Hunnell was slowly losing confidence in Schaller's ability to dispose of the goods, and so he finally saw Mr. Chapman, some time within a week after he found out that Mr. Schaller could not sell. Some time between the 10th and 20th of March he saw Mr. Chapman in his store. Chapman told him he would take 10 or 15 drums, but Hunnell did not want to sell any more, unless somebody would take it all. Chapman told him that it was too big for him to handle. Hunnell had subsequent conversations with Chapman, but did not sell to him.

In the Savery Hotel at Des Moines, on the 20th of March, Hunnell met Lipkin, Schaller, and Levey and told them that he was through with the deal and gave them Halley's cashier's check for $3,190, and told them, if they made anything out of the whole proposition, that he did not want any of it. Schaller then told him that, if they made any money, he would see to it that he got his share. Mr. Berg, the manager of the Red Line Transfer Company, was to get the 10 drums of denatured alcohol as his compensation.

At the time the plaintiff in error Halley purchased the alcohol on the 13th day of March, Hunnell did not know him, and did not say anything to Halley with reference to where the carload of alcohol had come from. Hunnell had known Schaller 14 or 15 years. Schaller was cashier of the Des Moines Drug Company for 8 or 10 years. Around the time that Hunnell had sold the alcohol to the plaintiff in error Halley, he called on various other druggists and individuals in town and attempted to sell the product, and it was after making the rounds generally and being unable to dispose of the goods that he made the statement that he was out of it, and at the time he pulled out he was convinced that the sale of it would be practically unprofitable.

Berg, the manager of the Red Line Trans-

fer Company, had been acquainted with Schaller and Hunnell for 10 years. They told Berg around the 1st of March that they had a carload of alcohol coming in, in which there were 70 drums of alcohol pure grain and 10 drums of denatured alcohol. He met them at the Martin Hotel about the 3d of March and had a conversation with respect to the bill of lading. Hunnell finally called Berg and told him that he washed his hands of this car and was done with it, and that was the last Berg ever heard of Hunnell. Berg testified, as to the date of the arrival of the car, that it arrived in Des Moines about the morning of the 3d or 4th or 5th of March, some place between the 3d and the 8th; as near as he could tell, right about the 6th of March.

The defendant Chapman corroborated Hunnell's statement in the main as to the conversation they had, in which Hunnell attempted to sell him the alcohol after Schaller had failed to get rid of it. About the 10th of March Hunnell and Schaller both came to his place of business. Again, a few days later, they came to see him. They told Chapman at that time that they had something like 60 barrels, and he told them that he did not know what he could do with that much alcohol and they left. A few days after that Hunnell saw Chapman and told him that he washed his hands of the deal; had nothing more to do with it, and left; but that same day or the next Schaller came to see him and made him a better price. The price was $4.25 or $4.50 a gallon. This conversation was had about the 15th day of March, and, after another conversation with Schaller, Chapman went to the Red Line Transfer & Storage Company about the 20th of March, and arranged to take over all of the product and pay Schaller after he had sold it.

At the time Chapman went to the Red Line Transfer & Storage Company, he saw about 50 or 60 drums and took a sample out of one of the drums. He got the sample about the 17th of the month, however, and gave it a hydrometer test and smelled it and tasted it. Chapman could not identify the particular drum that he took a product from. He testified that the product was grain alcohol. This testimony was admitted over the objection of the plaintiffs in error; and thereafter, and about the 20th day of March, Chapman sold some of the product to the plaintiffs in error, Dickerson and Halley. He also sold some to another defendant, Dave Masters; but he does not say that he sold any to the plaintiff in error, Eaton.

When Chapman made the deal with

Schaller, Schaller asked him if he thought he could dispose of it at the price quoted, and Chapman told him he thought he could. Chapman's testimony that he sold to Dickerson and Halley was admitted over the objections of the two plaintiffs in error. Chapman said that he did not see the plaintiff in error Conroy at the Red Line Transfer Company, but that Conroy came to his office at Ninth and· Grand, and told him that he and Dave Masters, another defendant, would buy together, or were buying together, and that thereafter he saw the defendant Masters at the Red Line Transfer Company about the 20th of March, where he loaded a quantity of alleged alcohol onto a conveyance for Masters. This evidence was admitted over the objections of the plaintiff in error Conroy.

Chapman said that it was late in the afternoon when the plaintiffs in error Dickerson and Halley hauled the product away. He said they came in during the afternoon, starting about 1 or· 2 o'clock and finishing about 5, and sometimes there was more than one there and sometimes only one. At the time Chapman began to handle this alcohol he did not know that it had come from a distillery in another state, and at the time he sold it to the plaintiffs in error he did not inform them where it had come from and did not know himself. He did not know, on or about the 10th day of March, that the shipment had come from Peoria. He did not know exactly how long the drums were in the warehouse before he knew they were there at all, and at the time he made the deal with Mr. Schaller he did not know where the stuff had come from, and Mr. Schaller had never told him where the stuff had come from until a few days after he had dealt it out to some of the plaintiffs in error. It was the next day after he had sold it and delivered it to the plaintiffs in error that he knew for the first time where it had come from. This evidence was undisputed.

The day Chapman finally gave a check in payment to Schaller for the alcohol, which was on the 21st day of March, after it was all disposed of, was the day that Schaller told Chapman where the liquor had come from. It was the day after the alcohol was delivered, and this day, he said, was very firmly and permanently fixed in his mind, because he issued the check the day after the alleged alcohol was delivered. Chapman, who was not in on the deal until after Hunnell and Schaller had been unable to dispose of the product, became a purchaser, and they became a seller. Chapman received something less than 5 drums himself personally

and sent it out to the Parmenter farm. This product was seized by the sheriff of Polk county at the Parmenter farm.

Berg was not acquainted with the defendant Chapman prior to the time Schaller finally sold him the product. Chapman sold 8 or 10 drums to plaintiff in error, Dickerson, and Dickerson paid Chapman. He sold 8 or 10 drums to Halley, and Halley paid Chapman. He sold 8 or 10 drums to the defendant Masters, and Masters paid Chapman. He sold some to the defendant John Olson, and John Olson paid Chapman. He saved 5 drums for himself and sent them out to the Parmenter farm.

The only one of the plaintiffs in error that it is claimed ever paid anything to the original conspirators for this product was the plaintiff in error Halley, but this was paid to Hunnell after Hunnell had requested another druggist, Brady, to buy the product from him or to send him a customer, and Brady sent Halley to him, and Hunnell at no time informed Halley where the product had come from or anything about it.

W. E. Kelso, a resident of Des Moines, was working at the Red Line Storage & Transfer Company on or about the 10th day of March, 1923, and helped unload the car in question. He was called as a witness on behalf of the government. He said that he saw Fred Chapman there, and that he saw the plaintiff in error Conroy there. He was asked what was said at the Red Line Transfer Company as to where the car had come from. He said it would be pretty hard to remember who said this and who said that; but, being pressed by the government, he finally said that the defendant Chapman, in the presence of the plaintiffs in error, said that the car had come from Peoria. He did not remember what date it was that this car came in, nor the day of the week. He did not know the plaintiff in error Conroy, nor Dickerson, prior to the time of this occurrence, nor the plaintiff in error Eaton. He did not testify before the grand jury. He first talked with counsel for the government four months before the case was tried, and had not talked with anybody else about the matter since March of 1923. He did not know whether it was snowing or not on the day that this occurred. He never talked with any one about this matter until more than two years after it had occurred. At the trial was the first time he had ever seen any of these parties since the day of the occurrence in 1923. At first he said the day he saw the plaintiffs in error at the Red Line Transfer & Storage Company was the day the car was unloaded,

which he testified on direct examination was on or about the 10th day of March.

Upon cross-examination he said that the date he claimed to have seen these men there was not the day the car was unloaded. He testified on cross-examination as follows: "The day I claimed to have seen these men there that I have named was not the day that the car was unloaded. The day I saw them there was on or about the 10th of March, or might be it could have been later. The reason I say on or about the 10th day of March is because I am not positive. The reason I say on or about the 10th day of March, instead of on or about the 20th day of March, is, as I answered before, I was not positive. I know that it took place in the early part of March. I am positive of that. I never had occasion to refresh any recollection on this matter from 1923 up until four months ago. When I say the first part of March, it is a matter that I have not been thinking about up until four months ago. I think it was not earlier than the 10th. It could have been as late as the 14th or 15th."

Other testimony in the record is that the plaintiffs in error were there on the 20th day of March, when they hauled away the alcohol from the Red Line Storage & Transfer Company, where it was stored. The above testimony of Kelso and the printing on the drums is all the testimony of any kind in the record that tended in any manner to show knowledge of where the car came from upon the part of the plaintiffs in error, if it can be said that that showed anything.

The shipment in question arrived in Des Moines on or about the 5th of March, 1923, and was, within a few days thereafter, transferred to the Red Line Transfer & Storage Company and unloaded at the warehouse. No evidence was introduced by any of the defendants. After the government had rested, each of the plaintiffs in error made a motion for a directed verdict upon all of the counts in the indictment, which motions were overruled, and exceptions preserved.

The plaintiffs have assigned 11 specifications of error. It is only necessary to consider specification No. 2, namely: "The court erred in overruling the motion for a directed verdict made by each of the plaintiffs in error, and erred in respect to each ground thereof."

[1] 1. The main assignment of error is that the evidence is not sufficient to connect plaintiffs in error with the conspiracy, the existence of which is not questioned. There are other assignments of error as to the first count, but, as we are disposing of the case upon the ground that the evidence introduced at the trial was not sufficient to carry the case to the jury, it will not be necessary to consider any other assignments of error as to such count.

After a careful consideration of the record, we are satisfied that the evidence upon which the government must depend to connect the plaintiffs in error with the conspiracy is that they bought some of the liquor, and that at the time the alcohol was being taken away from the Red Line Transfer & Storage Company building at Des Moines on the 20th of March, 1923, it was said by Chapman (who had been employed by the original conspirators, after the alcohol had arrived from Peoria at Des Moines and had been removed from the car and stored in the Red Line Transfer Company's building, to sell it) in the presence of the plaintiffs in error, that the alcohol had come from Peoria, and the further testimony that each of the drums bore the legend: "Complete denatured alcohol, proof 188. Kentucky Distilleries & Warehouse Company D. P. 141st Dist. Ill. Formula 5 I. C. C. 10."

The claim made by the government, and stated in their brief, that the plaintiffs in error were present when the car of alcohol came in from Peoria and was unloaded, is not borne out by the evidence. While Kelso, the witness, at first so stated, he afterwards changed his testimony and said he was mistaken about that. The most that can be said of this testimony is that it conveyed knowledge to the plaintiffs in error that the alcohol had been shipped from Peoria to Des Moines.

The testimony of Kelso on this point is very weak, but, assuming it to be true, we do not think that it is sufficient to charge the plaintiffs in error with knowledge of the conspiracy. The record shows very clearly that the plaintiffs in error had never taken any part in the general conspiracy or scheme and never knew of its existence, never participated in the profits or took any part in it in any manner, unless this can be inferred from the mere fact that at the time that the alcohol was delivered to them, some days after they had paid for it, they acquired the knowledge that the alcohol had been shipped from Peoria. There is, of course, the further fact that they purchased a large quantity of the alcohol from one or more of the conspirators. The evidence introduced by the government shows clearly that neither Hunnell nor Chapman, nor any of those who had to do with selling the liquor to the plain-

tiffs in error, gave them any information whatever concerning the conspiracy, or even as to where the liquor had come from.

This is the sum total of all the evidence upon which the government must depend to connect the plaintiffs in error with the conspiracy. The other evidence in the record touching this point is affirmative evidence introduced by the government to the effect that none of the conspirators who dealt with the plaintiffs in error informed them of the conspiracy, or anything about it. Chapman who was not in the deal until Hunnell and Schaller had failed to dispose of the product after its arrival, sold 8 or 10 drums to Dickerson, sold 8 or 10 drums to Halley, sold 8 or 10 drums to the defendant Masters, and testified as the government's witness unequivocally and undisputedly that, at the time he sold this alcohol to the plaintiffs in error, he did not himself know where the stuff had come from until the 21st day of March, after it was all disposed of, and that then for the first time Schaller told him where it had come from, and this was the day after the alcohol had been sold and delivered.

It will further be observed that Chapman was not in on the deal at all until after Hunnell and Schaller had been unable to dispose of the product, and it is Chapman whom the witness Kelso testified made the remark at the Red Line Transfer & Storage Company on the 20th of March, 1923, that the car had come from Peoria. As to the plaintiff in error, Eaton, the record is without dispute that he was not only not informed by any of the conspirators, but that he himself made inquiry of Berg if there was alcohol in the warehouse for sale, and Berg then called Schaller, and got Schaller's consent to sell 2 drums of alcohol to Eaton.

As to the plaintiff in error Halley the record is without dispute that, aside from the purchase of alcohol from Chapman without knowledge of any conspiracy, he first learned of the alcohol from Brady, whom Hunnell had solicited to find him a buyer, and at that time Hunnell did not even know Halley. Hunnell, the government's witness, testified without dispute that he had to tell Halley where to go to get the alcohol, and he. (Hunnell) had not told Brady either how he had secured this alcohol or where it had come from or anything of the kind. The government is here contending, as it must contend, if it claims conspiracy, that these plaintiffs in error had entered into an agreement and understanding with some of the conspirators, either before or after the alleged alcohol had been shipped, to transfer, possess, and dis-

pose of this alcohol. The testimony above referred to is depended upon by the government to establish this claim of conspiracy against the plaintiffs in error.

We think the most that can be said of this testimony is that it creates some suspicion, or gives rise to an inference, that the plaintiffs in error might have had some knowledge of the conspiracy at the time they purchased the liquor from one or another of the conspirators. Assuming that if they did have such knowledge, that would be sufficient to connect them with the conspiracy, but not so deciding, we think that the evidence is not sufficient to involve the plaintiffs in error in the conspiracy. The inference that plaintiffs in error had guilty knowledge and participation, drawn from the testimony of Kelso that the remark was made, in the presence of the plaintiffs in error, that the alcohol had come from Peoria, and the legend printed upon the drums, is also consistent with the innocence of the accused.

[2, 3] Wherever a circumstance relied on as evidence of criminal guilt is susceptible of two inferences, one of which is in favor of innocence, such circumstance is robbed of all probative value, even though from the other inference guilt may be fairly deducible. To warrant a conviction for conspiracy to violate a criminal statute, the evidence must disclose something further than participating in the offense which is the object of the conspiracy; there must be proof of the unlawful agreement, either express or implied, and participation with knowledge of the agreement. Linde v. U. S., 13 F.(2d) 59 (C. C. A. 8th Cir.); U. S. v. Heitler et al. (D. C.) 274 F. 401; Stubbs v. U. S. (C. C. A. 9th Cir.) 249 F. 571, 161 C. C. A. 497; Bell v. U. S. (C. C. A. 8th Cir.) 2 F.(2d) 543; Allen v. U. S. (C. C. A.) 4 F.(2d) 688; U. S. v. Cole (D. C.) 153 F. 801, 804; Lucadamo v. U. S. (C. C. A.) 280 F. 653, 657.

The mere fact that the plaintiffs in error purchased liquor from the conspirators is not sufficient to establish their guilt as conspirators. The purchaser may be perfectly innocent of any participation in the conspiracy. The gist of the offense is the conspiracy, which is not to be confused with the acts done to effect the object of the conspiracy. Iponmatsu Ukichi v. U. S. (C. C. A.) 281 F. 525.

In the case at bar there are no facts in the record that dovetail and fit together, so that a conclusion could be drawn that there was an understanding between the plaintiffs in error and those persons who entered into the scheme of purchasing and importing the liquor, other than the mere purchase by them

of some of the alcohol. So far as the record shows, they stand in the same relation as would a person who bought from a bootlegger, and the purchaser with guilty knowledge is not an accomplice of one who criminally sells to him. The statute is directed against the seller, not the purchaser. Merely as buyer he would not be a party to the conspiracy in any criminal sense. Bell v. U. S. (C. C. A.) 2 F.(2d) 543; U. S. v. Cole (D. C.) 153 F. 801, 804; Lucadamo v. U. S. (C. C. A.) 280 F. 653, 657; Singer v. U. S. (C. C. A.) 278 F. 415; Becher v. U. S. (C. C. A.) 5 F.(2d) 45; Baumgartner v. State, 20 Ariz. 157, 178 P. 30, 31; State v. Tremont, 160 Minn. 314, 200 N. W. 93; Lewis v. Commonwealth, 201 Ky. 343, 256 S. W. 710; Wilson v. State, 124 Ark. 477, 187 S. W. 440.

The following persons have been held not to be accomplices: A person purchasing beer on Sunday, State v. Baden, 37 Minn. 212, 34 N. W. 24; a person paying money for the suppression of evidence of a crime, State v. Quinlan, 40 Minn. 55, 41 N. W. 299; a woman submitting to an abortion, State v. Owens, 22 Minn. 238; State v. Pearce, 56 Minn. 226, 57 N. W. 652, 1065; a person giving or offering a bribe, State v. Sargent, 71 Minn. 28, 73 N. W. 626; State v. Durnam, 73 Minn. 150, 75 N. W. 1127. An inmate of a brothel is not an accomplice of the keeper. State v. Smith, 29 Minn. 193, 12 N. W. 524. A person who steals property and one who afterwards receives it from him, knowing it to have been stolen, are guilty of separate offenses, and without more neither is the accomplice of the other. State v. Gordon, 105 Minn 217, 117 N. W. 483, 15 Ann. Cas. 897.

[4] 2. As to count 4 of the indictment there was abundant evidence to warrant a conviction, and we see no reason to disturb the verdict as to that count.

For the reasons stated, the judgment of the trial court is reversed as to count 1 and affirmed as to count 4 of the indictment.