## BECHER et al. v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit. December 8, 1924.)

No. 29.

1. **Conspiracy ⊜⇒47—Evidence held to prove certain defendants parties to conspiracy to defraud government of customs duties and internal revenue taxes.**

In prosecution for conspiracy to defraud the United States of customs duties and internal revenue taxes by fraudulent withdrawal of liquor from bonded warehouse, in violation of Rev. St. § 2987 (Comp. St. § 5680), evidence *held* to prove certain of defendants parties to conspiracy.

2. **Conspiracy ⊜⇒47 — Evidence held to sustain conviction of certain defendants for conspiracy to violate the National Prohibition Act.**

Evidence *held* to sustain conviction of certain defendants of conspiracy to violate the National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138¼ et seq.) by possessing, importing, and selling intoxicating liquors, fraudulently withdrawn from bonded warehouse.

3. **Customs duties ⊜⇒125—Statute making it a crime to defraud government of customs duties by fraudulent withdrawal of liquor from bonded warehouse held not repealed by National Prohibition Act.**

Rev. St. § 2987 (Comp. St. § 5680), making it a crime to defraud United States of customs duties by fraudulent withdrawal of liquor from bonded warehouse, *held* not repealed by National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138¼ et seq.), in so far as it involved transportation which occurred before enactment of Supplementary Prohibition Act of November, 1921.

4. **Conspiracy ⊜⇒43(10) — Indictment charging conspiracy to defraud government by fraudulent withdrawal of liquor from bonded warehouse by forged permits held sufficient.**

In prosecution for conspiracy to defraud United States of customs duties and internal revenue taxes by fraudulent withdrawal of liquor from bonded warehouse, in violation of Rev. St. § 2987 (Comp. St. § 5680), indictment, describing forged permits by means of which liquor was withdrawn as similar to customs permit with specified number, *held* sufficient.

5. **Indictment and information ⊜⇒106—Forged instrument need not be set out unless prosecution is for forgery, counterfeiting, or misuse of mails.**

Indictment need not set out forged document in full, except in prosecutions for forgery, counterfeiting, or misuse of mails.

6. **Criminal law ⊜⇒1044—Question of failure of indictment to describe forged permits with sufficient accuracy not raised by motion to dismiss.**

In prosecution for conspiracy to defraud government of customs duties and internal revenue taxes by fraudulent withdrawal of liquor from bonded warehouse by means of forged permits, motion to dismiss *held* insufficient to raise question as to sufficiency of indictment for failure to describe the forged permits with sufficient accuracy.

7. **Conspiracy ⊜⇒23—Gravamen is formation of agreement.**

Gravamen of criminal conspiracy is formation of agreement.

8. **Conspiracy ⊜⇒27—Commission of overt act essential to prosecution.**

There can be no prosecution for conspiracy to commit crime until some overt act has been committed.

**9. Conspiracy ⬳27 — Conspiracy to defraud government of customs duties and internal revenue taxes, by fraudulent withdrawal of liquor from bonded warehouse, complete when agreement has been made and step taken in its execution.**

Crime of conspiracy to defraud government of customs duties and internal revenue taxes by fraudulent withdrawal of liquor from bonded warehouse, in violation of Rev. St. § 2987 (Comp. St. § 5680), was complete as soon as agreement was made and any step in its execution had taken place, and it is not necessary that liquor should be deposited in bonded warehouse or even imported.

**10. Criminal law ⬳787(1)—Instruction that no inference of guilt could be drawn from defendants' failure to testify without request therefor not error.**

Instruction that no inference of guilt could be drawn from defendants' failure to testify in absence of request therefor by defendants was not error, though in absence of such request it is better if court makes no reference thereto.

**11. Witnesses ⬳196 — Communication from agent to principal's attorney at time when principal was acting in hostility to agent held not privileged.**

Agent's communication to principal's attorney, on attorney's examination of agent to ascertain whether agent had converted principal's money at a time when agent was no longer active as principal's agent, *held* not privileged, since at such time principal was acting in hostility to agent.

**12. Conspiracy ⬳43(10)—Counts held sufficient as against contention that conspiracy is nowhere set up as whole.**

Counts charging conspiracy to defraud the United States of customs duties and internal revenue taxes, by fraudulent withdrawal of liquor from bonded warehouse, and to violate the National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138¼ et seq.), alleging in general the legal effect of conspiracy, and stating as introduction to details of agreement that "it was a part of said conspiracy" that conspirators should do acts enumerated, *held* sufficient as against contention that conspiracy is nowhere set up as whole.

**13. Conspiracy ⬳41—Defendant may be convicted of conspiracy to commit crime without being guilty of substantive crime itself.**

Defendant may be convicted as a party to conspiracy to defraud United States of customs duties and internal revenue taxes by fraudulent withdrawal of liquor from bonded warehouse, in violation of Rev. St. § 2987 (Comp. St. § 5680), without being guilty of substantive crime.

**14. Customs duties ⬳134—Evidence held insufficient to sustain conviction for fraudulent withdrawal of liquors from bonded warehouse without payment of customs duties and internal revenue taxes.**

Evidence *held* insufficient to sustain conviction of defendant for fraudulent withdrawal of liquor from bonded warehouse without payment of customs duties and internal revenue taxes, in violation of Rev. St. § 2987 (Comp. St. § 5680).

**15. Criminal law ⬳560—Jury must acquit if facts are compatible with either guilt or innocence.**

If state of facts is compatible with either guilt or innocence, jury must acquit.

**16. Criminal law ⬳782(9)—Refusal to charge jury to acquit defendant if evidence could not be reconciled with hypothesis other than innocence held not error.**

Refusal to charge that jury must acquit unless they could not reconcile evidence with any hypothesis except innocence *held* not error.

**17. Criminal law ⬳782(9)—Rule as to sufficiency of charge as to proof essential to conviction, stated.**

Charge as to proof essential to conviction is sufficient, if jury is told that prosecution must establish all facts to required degree of satisfaction of jury; no particular form being necessary.

**18. Criminal law ⬳698(1)—Hearsay and secondary evidence held sufficient to prove fact, in absence of objection.**

In prosecution for conspiracy to defraud government of customs duties and internal revenue taxes by fraudulent withdrawal of liquor from bonded warehouse, in violation of Rev. St. § 2987 (Comp. St. § 5680), bill of lading and copies of inspectors' slips *held* sufficient to prove identity of cases of whisky imported and those which were stored in warehouse, as against contention that bills of lading were hearsay evidence and copies of inspectors' slips were not the best evidence, in absence of objection to such evidence on such grounds.

**19. Criminal law ⬳696(4)—General motion to strike document held not objection to admissibility of evidence as to genuineness of signature.**

General and unspecified motion to strike out document at close of case *held* not objection to admissibility of evidence as to genuineness of signature.

**20. Criminal law ⬳1169(2) — Admission of bank's signature card to prove disputed signature held harmless in view of other evidence as to guilt.**

In prosecution for conspiracy to defraud by fraudulent withdrawal of liquor from bonded warehouse without payment of customs duties and internal revenue taxes, in violation of Rev. St. § 2987 (Comp. St. § 5680), erroneous admission of bank's signature card *held* harmless as to defendant shown guilty by 1,200 page record.

In Error to the District Court of the United States for the Southern District of New York.

Morris E. Becher, Murray E. Birnbaum, and Millard Friedberg were convicted of conspiracy to defraud the United States of

customs duties and internal revenue taxes by fraudulent withdrawal of cases of liquor from bonded warehouse, and of the substantive crime, and they bring error. Affirmed as to first and third named defendants, and affirmed in part and reversed in part as to second named.

Gilbert & Black, of New York City (Charles H. Tuttle, of New York City, of counsel), for plaintiff in error Becher.

George Z. Medalie and Emanuel Harris, both of New York City, for plaintiff in error Friedberg.

Vine H. Smith, of New York City, for plaintiff in error Birnbaum.

John Holley Clark, Jr., of New York City, for the United States.

Before HOUGH and MANTON, Circuit Judges, and LEARNED HAND, District Judge.

LEARNED HAND, District Judge. The three plaintiffs in error, in company with nineteen others, were indicted on June 29, 1923, upon nine counts, of which three alone remained at the trial, Nos. 1, 8, and 9. The first was for conspiracy to defraud the United States of customs duties and internal revenue taxes by the fraudulent withdrawal of 4,900 cases of whisky and 295 cases of champagne. The eighth was for a conspiracy to violate the National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138¼ et seq.) by possessing, transporting, and selling these intoxicating liquors. The ninth was for the substantive crime of which the first laid a conspiracy. The jury found guilty seven others besides the three plaintiffs in error, and all were sentenced to imprisonment. The chief conspirators were Emanuel H. Kessler and Morris E. Sweetwood, to whom the three plaintiffs in error acted as assistants or accomplices and who did not appeal. None of the defendants took the stand on his own behalf.

The outline of the conspiracy alleged, and as we think proved, was that Kessler and Sweetwood, acting in concert through the firm of Hartman, Goldsmith & Co., imported the whisky in question, had it placed in a bonded warehouse, afterwards withdrew it fraudulently without the payment of duties, and disposed of it unlawfully within the United States. Hartman, Goldsmith & Co. was an importing corporation composed of the defendants Aron and Friedberg, who were the New York agents for the Scotch manufacturers, and who under their own name made the importation in question in the autumn of 1921. When the whisky arrived in New York, it was stored in a bonded warehouse in the name of Hartman, Goldsmith & Co., who executed a bond for the payment of the duties and remained liable for the same.

By the procurement of Kessler and Sweetwood, the whisky was withdrawn towards the end of May, 1922, by means of forged permits, and it thereupon disappeared; just where no one knows. In March, 1922, Birnbaum procured an interest in a corporation known as the Standard Carpet Company, which did an apparently legitimate business, in the basement of whose building he later built a secret cellar in which some of the cases of whisky were found; the names of the importers being partially obliterated. Birnbaum was proved to have sold liquor from this cellar, though not of the importations here in question.

For the sake of simplicity we shall take up the cases of the defendants separately, since different considerations apply to each.

## 1. Becher's Case.

The theory of the prosecution was that Becher, with knowledge of the purposes of Kessler and Sweetwood, procured for Aron and Friedberg indemnity bonds of the United States Fidelity & Deposit Company of Maryland, to secure them against their liability for duties after the proposed fraudulent withdrawal from the warehouse. It became necessary, therefore, to show that he had knowledge of Kessler's purposes. To establish this, the prosecution proved the following facts: Becher first made application to another surety company before the whisky was withdrawn for a bond covering 1,000 cases in which one Frank J. Sullivan appeared as principal, the condition of which was to indemnify and save harmless Aron and Friedberg from any liability under their bond to the United States. The surety company demanded $15,000 indemnity upon this bond and upon Becher's failure to deposit the same asked for its return on June 3, at which time the whisky had already been withdrawn. Thereupon about the 20th of June Becher obtained four bonds from the United States Fidelity & Deposit Company of similar import upon four applications signed by Frank J. Sullivan. These bonds were dated from the 22d to the 25th of May and were signed by Sullivan. Under his arrangement with the company's agent, McFee, Becher was not required to make any indemnity deposit for these bonds. In them Sullivan figured as the purchaser of

the whisky which was to be withdrawn in his name, and he appeared upon the books of Aron and Friedberg as the buyer from them.

It was necessary for the prosecution to prove that Sullivan was either a wholly fictitious person or a dummy for Kessler and Sweetwood, and that Becher knew it. This was proved by a variety of circumstances. On August 7th after the transactions came under suspicion, one Wilson, representing the surety company, had a talk with Becher in which the latter said that Sullivan had shown him evidence that he had paid Aron and Friedberg $80,000; that he had investigated Sullivan's references and had found, among other things, that he had a deposit of $40,000 in the Pacific Bank. Aron and Friedberg's books showed a credit to Sullivan on March 25th of over $86,000 as a buyer, as we have said, and a debit on the same day against the name of Aron of exactly the same amount, with a clerical error of 5 cents. Aron's name upon the books had been written over an erasure, which the jury might reasonably have found originally contained the name of Kessler or Sweetwood. The books showed that Kessler and Sweetwood had lent the money to Aron and Friedberg upon the original importation. The debit to them, sub nomine Aron, to balance Sullivan's apparent credit, was made up of the repayment of this original loan, with interest, of another apparent loan of $10,000 with interest, and of $3,000 in addition. From this it was permissible, and in our judgment necessary, to conclude that Kessler had not been a lender at all, but that he had imported the whisky and had withdrawn it; the whole paraphernalia of entries being a fetch to disguise his connection. This was completely proved by the fact that Kessler, sub nomine Wood, paid Aron and Friedberg $16,200 in June, 1922, which, had the transaction been a loan, would have left him not quite whole as to his principal, to say nothing of any interest. The complicity of Aron and Friedberg with Kessler in the main outline of the conspiracy was undoubted.

This, however, did not prove that Becher was privy to the scheme. There might have been a Sullivan, Kessler's dummy, who, impersonating a buyer, imposed upon Becher. It was necessary for the prosecution to contradict this possibility, and this they did out of Becher's own mouth. As we have said, he told Wilson that he had verified Sullivan's bank account in the Pacific Bank, and it was proved that he had no such account. Again he told McFee in October that Sullivan was a fictitious person. It is argued that this was consistent with his subsequent discovery of that fact. Taken alone this might be so, but not in the face of his statements to Wilson that he had met him and run down his references. Nor is it consistent with the interpretation that by "fictitious" he only meant that Sullivan had turned out to be another person than he supposed. The statement about the deposit answers that. Finally, it was proved that Kessler gave him $40,000 to put up as indemnity with McFee, which McFee says he did not receive. If so, he could not have supposed that Sullivan was a genuine buyer; at least, Becher knew that he was acting for Kessler in the transaction.

[1, 2] We think that such a web of deceit and disguise was ample justification for a jury in concluding that Becher knew the general nature of Kessler's enterprise, at least that it involved the surreptitious and unlawful withdrawing of the whisky. They could scarcely have avoided the conclusion that he was guilty under the eighth count of a conspiracy for violating the National Prohibition Act.

It is, however, argued that though Becher may have been implicated in Kessler's scheme to sell the whisky unlawfully, there is not enough proof to hold him for defrauding the revenues. This argument too much ignores Becher's direct connection with that very part of the scheme. Aron and Friedberg must be secured if the withdrawals were to be fraudulent, because the liability would then be wholly theirs. Becher had undertaken to secure them before any of the whisky had been withdrawn, and his subsequent efforts were certainly in pursuance of an original agreement. The bonds were not in the least necessary if the withdrawals were to be regular. As we have shown, everybody was dealing with every one else on close terms. There was no Sullivan, or he was a mere dummy, and if there had been no fraud in prospect it seems incredible to us that Aron and Friedberg should not have seen to it that Kessler before withdrawing the whisky had paid the duties and had thus relieved them.

Becher knew all this and knew the false Sullivan who was to appear as buyer and to sign the bonds. He knew that Kessler was doing it all and meant to keep his connection with it secret. He further knew that Aron and Friedberg did not choose to protect themselves by insisting upon payment of the duties, but meant to take bonds of Sullivan. It seems to us barely credible that with full

knowledge of this whole front of fraud and disguise, Becher should have been ignorant of Kessler's actual plans.

Moreover, we find corroboration for this version in Becher's dealings with McFee, who supposing the transactions to be honest regarded the liability of his company as merely nominal. But Kessler did not think so, since he gave Becher $40,000 to secure the company. Why did he take it? Surely because he knew that the risk would seem actual to Kessler, who knew what they all contemplated, though it seemed insubstantial to McFee who did not. It is conceivable that Beecher should have in this merely turned a gratuitous knavish trick on Kessler, but the circumstance fits rather too neatly into the theory of the prosecution.

To sum up, we can scarcely believe that among such confederates it would be likely that in a matter so closely concerned with the very duty detailed to Becher he would or could have been kept in the dark as to their purposes. At least, there seems to us enough to justify a jury in so concluding. Whether we should have had any reasonable doubts ourselves is not to the point.

The ninth count was proved if the first was. As we have said, Becher began his efforts to get the bonds before the whisky was withdrawn. If there was an antecedent agreement by which this was to be his share of the common purpose, and if his procuring of the bonds was a condition to Aron and Friedberg's consent to the withdrawal, all were accomplices and therefore principals in the substantive crime.

[3] The claim that Revised Statutes, § 2987 (Comp. St. § 5680), was repealed by the National Prohibition Act, might have been good, had the events here in question occurred before the Supplementary Prohibition Act of November, 1921; but they did not. U. S. v. Stafoff, 260 U. S. 477, 43 S. Ct. 197, 67 L. Ed. 358, rules upon this point.

[4-6] The point is bad that the permit should have been set out in full in the ninth count. The forged permits on which the whisky was withdrawn could not be found, but the count described them with sufficient accuracy by saying they were similar to Customs Permit 7507. Had this been deemed an insufficient description, it could have been supplied by bill of particulars. However, the whole point is bad in law in any event, for the indictment was not for forgery, and it is only in cases such as forgery, counterfeiting, or the misuse of the mails that it is necessary to set forth the document in full. U. S. v. Heinze (C. C.) 161 F. 426. Finally,

5 F.(2d)—4

upon the motion to dismiss the point was not raised by any of the defendants and the bare motion to dismiss was not sufficient.

[7-9] The criticism of counts 1 and 8 qua pleading is not good. Under a charge of conspiracy the gravamen of the crime is the formation of the agreement. It is true that there can be no prosecution until some overt act has been committed, but it was not necessary that the whisky should be deposited in the warehouse or even should be imported. The crime was complete as soon as the agreement was made and any step in its execution had taken place.

[10] In his charge the learned trial judge without request from the defendants mentioned the fact that they had not taken the stand. With some elaboration he instructed the jury that no inference of guilt could be drawn from this. Becher now urges that any allusion to the fact was reversible error. It is no doubt better if a defendant requests no charge upon the subject, for the trial judge to say nothing about it; but to say that when he does, it is error, carries the doctrine of self-incrimination to an absurdity.

[11] Halle was an attorney for Kessler and Sweetwood. After the latter had discovered that Becher had not deposited with the surety company the $40,000 given to him as indemnity, they had an interview with him at which Halle was the spokesman. He questioned Becher as to what had become of the money, to which Becher falsely answered that he had delivered it to the surety company as indemnity. Becher objected to the evidence as incompetent upon the theory that he was Kessler's agent and that the communication to Halle, concededly Kessler's attorney, was privileged. The objection is clearly bad. Had Becher been still active as Kessler's agent, and had the communication been for the purpose of furthering Kessler's projects, it might perhaps have been privileged. We may so assume without expressing that opinion. But the interview was not of that character. Kessler was acting then in hostility to Becher, suspecting that he had converted his moneys, and questioning him with a view to their possible recovery. Such a communication is in no sense privileged, but is between the client on the one hand and a third person on the other, as an opposed party.

We see no error in Becher's trial, and as to him the judgment is affirmed.

## 2. Friedberg's Case.

After what we have already said, it seems to us scarcely necessary to say much about

the only point which Friedberg raises, the sufficiency of the proof as to him. He knew of the false Sullivan and that he was merely a disguise for Kessler. He knew that Kessler had imported the whisky, stored the whisky, would withdraw the whisky, and must sell the whisky. He could have no illusions about his purposes. As to his complicity in the fraudulent withdrawal, as in Becher's case, the proof is not quite so strong. Yet it was he who insisted on the bonds, though he had it in his power to require Kessler to pay the duties before he withdrew the liquors. It was he who by his letters of July 17, 1922, began to lay a foundation for recovery from the surety company on what he knew to be a fraudulent claim, a claim in the name of Sullivan who had disappeared because he never existed. It appears to us merely a waste of words, in the face of all this, to argue in detail that a jury had no basis on which to involve him in that feature of the scheme in which he was so vitally concerned and which he took such care to make safe.

As to Friedberg the judgment is affirmed.

### 3. Birnbaum's Case.

[12] The first point in Birnbaum's case is that counts 1 and 8 charge no crimes. Each is cast in the same form; it alleges in general the legal effect of the conspiracy, and then, as introduction to the details of the agreement, that " it was a part of said conspiracy" that the conspirators should do so and so. The challenge is that nowhere is the conspiracy set up as a whole. This is a misconception of a form in use for many years in this circuit. The phrase is to be interpreted, not as a meaning that the conspiracy was in part as alleged, but that the acts alleged were within the joint scheme, that they were a parcel of it. When finally enumerated, these acts are to be taken as an exhaustive summation of the whole criminal agreement, and the count lays a good charge.

The next point is the invalidity of the search warrant on which the premises of the Standard Carpet Company were searched. We find it unnecessary to discuss the details of these affidavits more than to say that we find it difficult to see how any warrant could stand on reasonable inferences if this is to fail.

The most important point, and one in which in part we agree with the defendant, is of the sufficiency of the proof connecting him with the conspiracy. It was indeed abundantly proved, and but faintly if at all disputed, that the jury might well have found Birnbaum guilty of selling liquors unlawfully, but that he argues is quite another charge. Of course, we agree, but the circumstances as a whole leave no doubt that he was implicated at least in Kessler's general enterprise, and was not as he argues merely a buyer from him. We concede at once that merely as buyer he was not a party to the scheme in any criminal sense, that on the contrary the prosecution was bound to involve him in the plan as a whole in some other sense; but the proof was ample. While none of his sales were traced back to any of the liquor here in question, some cases with the marks partly obliterated were discovered in his cellar, secreted with an elaboration which was proof positive that he had established a cache for illegal liquors which was to be continuously used as such. We need hardly go into the details or the means of disclosure; they deeply involved him in the illegal trade.

Still all this was indeed equally consistent with his being a large buyer and did not show his complicity with Kessler. The other proof did. His entry into the Standard Carpet Company was an obvious cover for his purposes, since he there made his cache and thence he sold his contraband liquor. There he was at times visited by Kessler, Sweetwood, and Fox. The fact which to our mind ends any doubt is the payment of $40,000 made by Kessler sub nomine Wood to Birnbaum on March 7th. That was shortly after the conclusion of his bargain with Rosenthal by which he got a half interest in the carpet company. He had paid Rosenthal $32,000 and later in July eventually forced him out altogether by a final payment of $10,000. The sufficiency of the proof of this payment is challenged, but the point is trivial. The absence of the cashier's check rendered competent the stub which was presumably made out at the same time, and there was ample proof that it recorded a payment from Wood to Birnbaum.

[13, 14] This was wholly inconsistent with the supposition now put forward that Birnbaum was merely a buyer of Kessler's liquors. If so, the payments would have been from him not to him. It is difficult to see how any other reasonable conclusion could be reached than that he was acting for Kessler when in the early part of the year he got his first share in the carpet company. His connection with Fox in the year 1921 gave some corroboration to such an inference.

However, it was one thing to prove that Birnbaum was privy to Kessler's scheme to

dispense whisky unlawfully, and another that he knew anything of that detail which involved defrauding the United States of its revenues. The chances are indeed pretty strong that he did, but we have been unable to find in the record any evidence on the matter. It seems to us quite possible that although he is shown in February to have been devising means by which Kessler should secrete the whisky, he was not informed of how Kessler was to get it out of bond, or indeed whether it was to come in regularly or by illicit importation. We all agree that the conviction must therefore be reversed upon the ninth count, but my brothers think that that upon the first should be affirmed. They invoke the principle that when once a man is shown to have engaged in a conspiracy to commit some illegal act he becomes criminally liable for everything which his accomplices may do in its execution. Birnbaum being shown in February to be in the plot to sell the whisky became therefore privy to the fraud upon the United States which Kessler and Friedberg and Becher later perpetrated in its execution. Speaking for myself alone, I cannot concur in this conclusion. When the books say that a conspirator is responsible for all that is done by his fellows without his knowledge, I understand no more than that their conduct will be competent proof against him; as for example, if it be pleaded as an overt act, or introduced in evidence as showing the scope of the scheme. To say that every one once shown to be engaged in a criminal agreement thereby becomes involved as a party in all independent criminal agreements, even though they be ancillary to the first, seems to me to contradict the primary test of criminal responsibility that a man must be aware of the acts with which he is charged. The result in the case at bar makes no difference in the term of Birnbaum's imprisonment, since the same sentence was imposed on all counts to run concurrently, but it does affect the fine of $10,000.

[15-17] Birnbaum's attorney asked the court to charge that the jury must acquit unless they could not reconcile the evidence with any hypothesis except innocence. This Judge Winslow declined, relying on his colloquial instructions which so far as we can see included the request asked. We should not indeed stop to notice the matter at all, except that the point seems to us to rest on a misconception of what it is ever necessary for a trial judge to say. It is of course true that if a state of facts is compatible with either guilt or innocence the jury must acquit;

the guilt is not shown at all, to say nothing of reasonable doubts. But that is necessarily involved in charging them that they must positively find all the facts which make up the crime. It is perhaps a convenient thing, arguendo, for a judge to illustrate his meaning by such examples, but it is not in the least degree necessary. Nothing is more conducive to the absurd formalism, which even yet at times invades a criminal trial, than to suppose that there is a ritual which must be repeated if the charm is to work. We wish once more, since it appears to be necessary, to repudiate altogether any such putative requirement. It is enough if it appears that the jury has been told that the prosecution must establish all the facts to the required degree of satisfaction of the jury, and there is no fixed way in which this need be communicated, so long as that idea is evident. Had the learned judge not only refused the request, but said nothing of the kind in his charge, he would have been altogether justified, so long as the substance of what he said showed that the prosecution must prove its case.

[18] There are a number of exceptions to the admission of evidence, of which we need notice only the more important. The first is that it was error to admit the proof of identity between the cases of whisky imported and those which were stored in the warehouse. This was done as follows: The bills of lading on which they were imported were put in evidence. It is alleged that this was hearsay evidence of the fact that the cases bore the same numbers. No such objection was taken at the time, assuming that it would have been good. Next the correspondence of these numbers with those of the cases stored in the warehouse was shown by certain transfer slips made by Sobel, the United States storekeeper, as a record of the cases stored. These numbers he did not get from inspection of the cases, but from slips made by inspectors who had seen the cases and recorded the numbers. The inspectors' slips would have been good primary evidence, being official documents recording the personal observation of the official. Sobel's copies were good secondary proof, and no objection was made that the inspectors' slips were not themselves produced.

[19, 20] The other point we think it necessary to discuss is that disputed signatures were proved by comparison with documents bearing genuine signatures which were not independently relevant, contrary to the rule in Hickory v. U. S., 151 U. S. 303, 14 S. Ct. 334, 38 L. Ed. 170, and Williams v. Con-

ger, 125 U. S. 397, 8 S. Ct. 933, 31 L. Ed. 778. It is quite, true that Sweetwood's signature to a bond signed by him for his appearance in answer to a criminal charge was offered for this purpose, but no objection was made at the time either to its admission or to the purpose for which it was to be used. A general and unspecified motion to strike out the document made at the close of the case, not raising any such objection, will not serve. Exhibit 11 was Kessler's card in the Manufacturer's Trust Company. It was not proved as his when admitted, but the correctness of the copy of his account in the bank was admitted. Conceding that Kessler had such an account, the authenticity of the signature was proved prima facie. It was relevant, moreover, since some of the items of the account were relevant. Exhibit 47 was Kessler's signature card in the Chatham & Phœnix Bank. It was proved but was probably irrelevant. The signature cards of Grimes and Jordon in the Harriman Bank were neither relevant nor authenticated. We decline to make such errors the basis of a reversal in the face of a record of over 1,200 pages. The identity of "Wood" with Kessler and ·Sweetwood was proved by many other circumstances and could not reasonably be doubted. It depended in no sense on Kessler's signature cards. The identity of Grimes or Jordon with Sullivan may or may not have been argued at the trial; we have no means of knowing it. In any event, this is a point raised only by Birnbaum, and we have found that the evidence was not enough to connect him with the fraudulent withdrawal of the whisky, with which Grimes, Jordon, and the putative Sullivan were concerned.

The judgment is affirmed on all counts as to Becher and Friedberg. It is affirmed as to Birnbaum except as to the ninth count, as to which it is reversed.