**UNITED STATES of America**

v.

**Mamie KENSIL, Walter Klopfer, Dominic Sparagno, Richard Ferraro, Leroy Haith, Jacqueline Haith, et al.**

**Crim. No. 20384.**

United States District Court
E. D. Pennsylvania.
June 5, 1961.

Walter E. Alessandroni, U. S. Atty.,
Joseph J. Zapitz, Asst. U. S. Atty., Phila-delphia, Pa., for plaintiff.

Lawrence Goldberg, Philadelphia, Pa., for Mamie Kensil, defendant.

Jos. A. Hagerty, Philadelphia, Pa., for Walter Klopfer, defendant.

Louis Lipschitz, Philadelphia, Pa., for Dominic Sparagno and Richard Ferraro, defendants.

Thos. L. Hicks, Jr., Richmond, Va., and Alvin E. Echols, Jr., Philadelphia, Pa., for Leroy Haith and Jacqueline Haith.

KRAFT, District Judge.

Of the nineteen defendants indicted in this proceeding nine pleaded guilty; the charges against three were dismissed by the Court; one was acquitted by the jury; the remaining six were found guilty on the conspiracy count; and one of the six, Mamie Kensil, was found guilty on the substantive counts.

Now before us are motions for judgment of acquittal, or, in the alternative, for a new trial, filed by the six defendants found guilty by the jury.

The indictment is in four counts. The first count charged all defendants with conspiracy (1) to engage in and carry on the business of a distiller without having given the bond required by law; (2) to possess and control a still and distilling apparatus without legally registering the same; (3) to make and ferment mash fit for distillation on premises other than an authorized distillery; (4) to transport, possess, buy, sell and transfer distilled spirits in immediate containers not stamped to evidence the determination of the tax. The remaining counts are substantive in nature and charge certain of the defendants with the same overt acts as are alleged to have been the first three objects of the conspiracy.

In considering the motions for judgment of acquittal as to each defendant, it is incumbent upon us to make a careful examination of the evidence to ascertain "whether all the pieces of evidence against the defendant, taken together, make a strong enough case to let a jury find him guilty beyond a reasonable doubt." United States v. Allard, 3 Cir., 1957, 240 F.2d 840, 841. The verdict must be sustained if there

is substantial evidence, taking the view most favorable to the Government, to support it. Glasser v. United States, 1942, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680.

On February 9, 1960, agents of the Alcohol and Tobacco Tax Unit raided an illicit still on premises known as the Old Schmidt Farm, on Hunt Road, Bedminster Township, Bucks County, Pa. The uncontradicted evidence established that several of the defendants were actively engaged in the operation of the still from about November 1, 1959, to the day of the raid.

### Mamie Kensil

The Government's case against Mrs. Kensil rests largely upon the testimony of Lewis Hiatt, named, but not indicted, as a co-conspirator. Hiatt's testimony may be briefly summarized. In the latter part of 1959, Hiatt was employed by Edward Kensil "to take supplies and finished product to and from an illicit still." (Edward Kensil, husband of Mamie Kensil, was a prime mover in the illegal enterprise and pleaded guilty during the trial). On or about October 20, 1959, Mr. and Mrs. Kensil and Hiatt left the Kensil home in Philadelphia, in Kensil's car, to go to the Schmidt Farm. Hiatt testified that, during the trip, Mrs. Kensil "told me that I had to be very careful in my travels to and from the place so that I wouldn't be seen entering it or leaving it." On their arrival at the farm, Mrs. Kensil went into the house and Kensil and Hiatt proceeded to the barn, which was 150 to 200 feet from the house. Several of the defendants were working in the barn and Kensil pointed out the "pot" and the "thumper" and explained their purposes. On the way back to Philadelphia that evening, Mrs. Kensil stated that "she didn't see how they expected a joint to operate without drops or vehicles," and again cautioned Hiatt that he would have to be very careful going "to and from the place." In the course of a conversation at the Kensil home that same evening, Kensil further ex-

plained to Hiatt "the workings of a still, and how to pick up supplies and deliver them, and how to take the goods out and dispose of them." Mrs. Kensil was present at this conversation and said to Hiatt, "you listen to Eddie. He knows what he is doing."

Mr. and Mrs. Kensil, together with Hiatt, went to the still site the following day, again in Kensil's automobile. Mrs. Kensil went into the house while Hiatt and Kensil repaired to the barn. The same defendants were in the barn as on the previous visit, and one of them was engaged in erecting vats. Hiatt testified that Kensil "further explained the mash and all to me."

Hiatt went to the Kensil home the next morning and Kensil stated that to complete the erection of the still they would need bricks "for a fire base to erect the boiler upon, and some sort of a drainage system for what they call slop." Mrs. Kensil was present and joined in the conversation. Mr. and Mrs. Kensil and Hiatt then proceeded to the still site in Kensil's automobile, and Kensil "talked further on getting the still erected so it would operate, and the disposition of the goods, and the use of vehicles and drops." Mrs. Kensil joined in this conversation, and again warned Hiatt to be "careful". Mrs. Kensil stayed in the house, while Kensil and Hiatt worked in the barn.

Hiatt testified that he returned to the still site with Kensil, in the latter's car, every day until the 4th or 5th of November (1959), and that Mrs. Kensil was with them "with the exception of a couple of times."

On an occasion when Hiatt was about to remove an oil "burner" from the still site, Mrs. Kensil told him several times to be sure and file off "all the numbers and identifying marks and emblems."

In the latter part of January 1960, according to Hiatt, Mrs. Kensil was in the automobile when Kensil drove him to Rising Sun, Maryland, to pick up supplies for the still.

Finally, Hiatt testified that on one occasion Mrs. Kensil brought food to the farmhouse and sat at the table with her husband and others of the defendants.

In addition, there was testimony by Robert Kennedy, who leased the still premises and who pleaded guilty, that Mrs. Kensil was present during the discussion about the still between the witness and Kensil at the latter's home in Philadelphia.

■ Counsel for Mrs. Kensil contends that, granting the evidence established the existence of a conspiracy, the Government has failed to show that Mrs. Kensil was at any time a member of the conspiracy. We disagree. The elements necessary to constitute one a conspirator were well stated in Jones v. United States, 10 Cir., 1958, 251 F.2d 288, at page 293:

"A person does not become liable as a conspirator unless he knows of the existence of the conspiracy, agrees to become a party, and with that knowledge commits some act in furtherance thereof. United States v. Falcone, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128; Laska v. United States, 10 Cir., 82 F.2d 672, certiorari denied 298 U.S. 689, 56 S. Ct. 957, 80 L.Ed. 1407; Skelly v. United States, 10 Cir., 76 F.2d 483, certiorari denied 295 U.S. 757, 55 S.Ct. 914, 79 L.Ed. 1699; Booth v. United States, 10 Cir., 57 F.2d 192. This knowledge and participation may be inferred from the circumstances, acts and conduct of the parties."

■ Hiatt's testimony, if believed, established beyond peradventure that Mrs. Kensil knew of the existence of the conspiracy, and, with such knowledge, directed, advised and counselled in the attainment of its objectives. That she agreed to become a party to the conspiracy follows as an irresistible conclusion. Hiatt's credibility and the inferences to be drawn from his testimony were for the jury.

Counsel suggests that Mrs. Kensil's statements and actions were equally consistent with innocence, and were made "in the interest of her husband's welfare and safety." Defendant's conduct, her instructions to Hiatt, her extended relationship with admitted conspirators and the circumstances of her association with them,—all these pointed unerringly to guilt. There was more than mere "casual and unexplained meetings" with others who were convicted as conspirators. United States v. Falcone, 1940, 311 U.S. 205, 210, 61 S.Ct. 204, 85 L.Ed. 128. Whether defendant's motivation was concern for her husband's welfare, was left to the jury in a charge to which there were no objections or exceptions. The jury might well have found that wifely solicitude would have counselled total abstention from participation in the illegal venture.

■ Equally untenable is the contention that the evidence was insufficient to sustain the verdict on the substantive counts. Our review of Hiatt's testimony persuades us that the jury was fully warranted in finding Mrs. Kensil guilty as one who "aids, abets, counsels, commands, induces or procures" the commission of the offense. 18 U.S.C. § 2(a). Moreover, her presence at the still site raises a statutory presumption sufficient to authorize her conviction. 26 U.S.C. § 5601(b) (1) (2) (3) (4).

In support of her motion for a new trial, Mrs. Kensil complains of error in the charge in that the Court failed "to explain to the jury the relationship of conspiracy to the substantive crimes, and the differences between aiding, abetting and conspiring." Because of the inherent nature of conspiracy, the difficulties it presents to both the lay and professional understanding and the dangers implicit in its injudicious and indiscriminate use, we were at particular pains to clarify as best we could a confused and confusing subject. We need only refer to the masterly concurring opinion of Mr. Justice Jackson in Krulewitch v. United States, 1949, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790. We

shall not lengthen our opinion by tedious quotations from the charge, but we point out that the charge on conspiracy covers 35 pages of the transcript. This included the relevant statutory provision (18 U.S.C. § 371), definitive excerpts from the opinions of our highest Courts and a summary of the evidence as it related to each defendant. As to the substantive crimes, the charge with respect to each count covered the statutory provision and a detailed analysis of its alleged application to Mrs. Kensil, the only defendant whose case went to the jury on the substantive counts. On the subject of aiding and abetting, the charge included the statutory provision (18 U.S.C. § 2(a), and a definition in the Court's language of the statutory terms.

■■ Our review of the charge in its entirety persuades us that the jury fully understood the issues committed to their decision and the legal distinction between the three classes of crime.[1] We are confirmed in this belief by the fact that after a 3-week trial and a necessarily lengthy charge, the jury expressed no desire for additional instructions. Moreover, counsel for Mrs. Kensil made no suggestions or objections with respect to the charge, although given ample opportunity to do so. It goes without saying that one may be both conspirator and abettor. Nye & Nissen v. United States, 1949, 336 U.S. 613, 630, 69 S.Ct. 766, 93 L.Ed. 919.

We find no merit in the contentions of the defendant, Mamie Kensil, and, accordingly, her motions will be dismissed.

The remaining defendants whose motions are before us were found guilty only on the conspiracy charge.

### Walter Klopfer

Klopfer was employed as manager of a beer distributing business operated in Philadelphia by his nephew, who leased a row of five garages which were used for storage purposes. Klopfer had keys for the garages and visited them two or three times a day in the course of his employment.

Hiatt testified that in the early part of November 1959, he drove a pickup truck to the garages; that Klopfer opened the door of a garage and Hiatt backed his truck into it. Hiatt and Klopfer then loaded about 30 100-pound bags of sugar on the truck and Hiatt took it to the still site. There was no transfer of money on this occasion.

About a week later, Hiatt again went to the garages for sugar. Kensil was present. Klopfer loaded 20 100-pound bags of sugar on the truck while Hiatt stacked it. Hiatt then took the sugar to the still site. Again, Hiatt saw no transfer of money. From the middle of October (sic) 1959, until about the first week of February 1960, Hiatt went to the garages to pick up sugar from two to four times a week. On each occasion, he got anywhere from 1600 to 2500 pounds of sugar which he took to the still. Asked who was present on these visits, Hiatt testified, "Just Walter Klopfer and myself with the exception of a few times when Eddie Kensil was present with or without Leroy Roezell." These calls were made anytime from seven o'clock in the morning until eight or nine at night. Klopfer always helped Hiatt put the sugar into the truck. On one occasion, Hiatt gave Klopfer $400 which he had received from Kensil. Kensil said to Klopfer on one of his visits to the garage that he would have to pay him off in "goods" because his "dumb partners won't come up with any money." Klopfer refused the offer but said he would like "a little bit of the goods." In consequence, Hiatt gave Klopfer a five-gallon keg of "whiskey that came from the joint." In reply to Klopfer's query, Hiatt told him that the "stuff" was supposed to be pretty good. It appears not to be disputed that the

[1]. For a concise statement of these distinctions, see separate opinion of Mr. Justice Rutledge in Pinkerton v. United States, 1946, 328 U.S. 640, 648, 66 S.Ct. 1180, 90 L.Ed. 1489.

container was without stamps. On one occasion, according to Hiatt, Klopfer said to him, "You guys must have a big joint going to use this much sand."

Some time in February 1960, following the raid, Agent Ginn with other investigators visited the garages and interviewed both Klopfer and his employer. They found in one of the garages a white crystalline substance which was later determined to be sugar. Klopfer told the investigators that he had never seen any sugar in the garages, and denied that he had ever sold sugar to anyone.

Counsel concedes that the evidence would support a finding that Klopfer knew the sugar was to be used for an illegal purpose, but contends that it is wholly insufficient to prove beyond a reasonable doubt that Klopfer knew that the buyers were parties to a conspiracy to operate an illegal still. He relies upon United States v. Falcone, 1940, 311 U.S. 205, at page 210, 61 S.Ct. 204, at page 207 where it was held:

"Those having no knowledge of the conspiracy are not conspirators, United States v. Hirsch, 100 U.S. 33, 34 [25 L.Ed. 539]; Weniger v. United States [9 Cir.], 47 F.2d 692, 693; and one who without more furnishes supplies to an illicit distiller is not guilty of conspiracy even though his sale may have furthered the object of a conspiracy to which the distiller was a party but of which the supplier had no knowledge."

■■ We think the evidence amply supports the verdict. Hiatt's testimony, if accepted, almost compelled the finding that Klopfer knew of a combination or confederation engaged in the operation of an illicit distillery. He was not, of course, required to know the identity, or even the number, of all his confederates. United States v. Andolschek, 2 Cir., 1944, 142 F.2d 503, 507.

It is true, as counsel points out, that in Falcone the Court did not reach the question whether knowledge of a con-spiracy "would make them (suppliers) conspirators or aiders or abettors of the conspiracy." 311 U.S. 205, 210, 61 S. Ct. 204, at page 206. However, that question has received an affirmative answer in several of the Courts of Appeals, including our own. Pernatto v. United States, 3 Cir., 1939, 104 F.2d 427; United States v. Pandolfi, 2 Cir., 1940, 110 F.2d 736; United States v. Harrison, 3 Cir., 1941, 121 F.2d 930; United States v. Giuliano, 3 Cir., 1959, 263 F.2d 582.

The facts before us are somewhat similar to those in United States v. Piampiano, 2 Cir., 1959, 271 F.2d 273. There, Amico, a partner in a produce business dealing primarily in fresh fruits and vegetables and only occasionally in buying sugar, arranged for purchase from a wholesale company of large quantities of sugar which was paid for in cash and handled separately from the partnership account, and picked up in an unmarked truck and delivered to the still site. In holding the evidence sufficient to sustain a conviction, the Court used language pertinent in the present instance (at page 274):

"Amico invokes United States v. Falcone, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128, affirming 2 Cir., 1940, 109 F.2d 579, for the proposition that a mere supplier, even one aware of the illegal purpose of his purchaser, cannot be held as a co-conspirator. But here Amico did much more than act as a supplier. Contrary to the facts in Falcone, Amico deviated from his usual line of business in purchasing large quantities of sugar. He did not sit back and simply accept orders that came his way but began dealing in a commodity almost entirely new to him and in a manner quite different from his other business transactions.

"Amico was willing to and did take measures to make it difficult to trace the sugar. The jury might reasonably have found that the secretive manner of his purchases was

indicative of an intent actively to further the conspiracy. Direct Sales Co. v. United States, 1943, 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674. His conduct, it could be found, showed an interest in seeing that the illegal operation prospered and continued and that it would avoid detection."

Klopfer's motion for judgment of acquittal is without substantial merit and will be dismissed.

## Leroy and Jacqueline Haith

Lewis Hiatt testified that he first met Haith in the early part of November 1959, at a restaurant in New Jersey on the northbound lane of the New Jersey Turnpike, below the Mt. Holly and Burlington exits. Haith was alone on this occasion, and drove a two-door Buick bearing Virginia license plates. Hiatt informed Haith how many cases of "goods" he had for him, and told him where to meet Kensil. Hiatt then took Haith's car to a "drop", loaded it with twenty 6-gallon cases of "booze" that he had taken from the still and then drove it to another restaurant on the southbound lane of the Turnpike. Haith got out of Kensil's car, entered the Buick and drove southwardly on the Turnpike.

Two days later, Hiatt delivered to Haith the "same quantity" of illicit liquor, in what he described as identical circumstances.

From this time on, according to Hiatt, Haith "came up" every other day, except that he missed a day now and then. Haith's wife, defendant Jacqueline Haith, was with him on occasion. On arrival at a meeting place apparently pre-arranged between Haith and someone other than Hiatt, they exchanged vehicles; Hiatt loaded Haith's vehicle with 20 to 24 cases of alcohol from a "drop" in Pitman and met Haith at another place, where they again exchanged vehicles. The alcohol came from the still on the Old Schmidt Farm. On two or three occasions, Haith gave money to Hiatt at the time of these de- liveries, and Mrs. Haith did so once. Each sum was $500 or thereabouts.

Hiatt testified that he made 50 or 60 deliveries of illicit spirits to Haith approximately between November 1, 1959, and February 8, 1960; that Mrs. Haith was with her husband on about 30 of these occasions; and that "once or twice" he delivered liquor to Mrs. Haith when she was alone. He said that he looked at the containers at the time of the transfers to Mr. and Mrs. Haith and that he didn't see any "Federal tax stamps" affixed either to the cases or the jars.

■ We shall first consider the Government's case against Leroy Haith. We do not agree that the evidence fails to establish that Leroy Haith had knowledge that "the sellers and/or transferors" of the distilled spirits consisted of two or more members of an existing conspiracy. Hiatt told Haith at the very first meeting "where to go to meet Eddie Kensil", and later saw Haith "getting out of Eddie Kensil's car." This was no "casual and unexplained" meeting. United States v. Falcone, 311 U.S. 205, 210, 61 S.Ct. 204, 85 L.Ed. 128. In the entire context of the circumstances, the inference is irresistible that Kensil was present in connection with the transfer of the liquor and that Haith knew it. Haith thus knew of an illegal combination to possess, transfer, sell, etc., untaxed spirits. Defendant admits in his able brief that, "Knowledge of all the members of the conspiratorial group and detailed information as to the function of each member is not required before one is held to have joined an existing unlawful venture." See, also, United States v. Andolschek, 2 Cir., 1944, 142 F.2d 503, 507.

■ Haith insists that the evidence establishes only a series of "simple sales" of illicit spirits, and contends that the "mere purchase" does not make one a member of a conspiracy in which the seller is a member. The Court charged that if a crime necessarily involves mutual cooperation of two persons, and if

those two persons have in fact committed the crime, they may not be convicted of a conspiracy to commit it. See United States v. Katz, 1926, 271 U.S. 354, 46 S.Ct. 513, 70 L.Ed. 986, among other cases. It was left to the jury to determine whether the transfers to Haith constituted sales, without more; or sales for the purpose of resale; or not sales at all, but mere steps in a plan or scheme of distribution of the illicit spirits whereby they were placed in the hands of the ultimate consumers. The verdict establishes that the transfers were more than "simple sales". Considering their frequency and the quantities involved, the jury could have reached no other reasonable conclusion. The evidence proves beyond doubt that Haith not only was a part of the chain of distribution, but that he knew he was a part and was acquainted with a substantial number of the other participants. What was said in United States v. DeVasto, 2 Cir., 1931, 52 F.2d 26, 30, 78 A.L.R. 336, is particularly apt here:

"It is insisted by these appellants that the proof showed merely that they were purchasers, and that purchasers of intoxicating liquor are not liable as conspirators with the sellers. Norris v. United States, 34 F.(2d) 839 (C.C.A.3), reversed on other grounds, 281 U.S. 619, 50 S.Ct. 424, 74 L.Ed. 1076; Becher v. United States, 5 F.(2d) 45, 50 (C.C.A.2); United States v. Heitler, 274 F. 401, 405 (D.C.E.D. Ill.). Assuming that a proper construction of the National Prohibition Act [27 U.S.C.A.], which failed to make the purchase of liquor criminal, forbids holding that a purchaser as such is a coconspirator with the seller, the facts in the present case do not include it within such rule. Here the purchases were not for personal consumption, but for resale. These appellants were steady purchasers from the beginning of the Columbia Company's operations. The jury could find

that they had knowledge of the proved conspiracy to manufacture, transport, and sell, and that they actively assisted to further the ends of the conspiracy by acting as distributors of the brewery's output of undealcoholized beer."

Haith further contends that the evidence fails to show knowledge on his part of the source of the alcohol, and that without knowledge that it was being produced by a conspiracy in which Hiatt was a member, Haith cannot be deemed to have joined the specific conspiracy alleged in the indictment. We are not impressed by this argument. Haith knew of the existence of a conspiracy to violate the internal revenue laws relating to distilled spirits, and knew, under the evidence, that Hiatt and Kensil were parties to it. It was not necessary, in order to make Haith a participant therein, that he know the identity or number of his confederates, or their precise functions. It was enough that he know the central aim and objective of the confederation, and that he join therein. It was not a sine qua non that he know the exact source of the alcohol so long as that source lay within the known general design and purpose. As stated in United States v. Andolschek, 2 Cir., 1944, 142 F.2d 503, 507, when a party to a conspiracy "embarks upon a criminal venture of indefinite outline, he takes his chances as to its content and membership, so be it that they fall within the common purposes as he understands them."

In similar vein, Haith argues that there was a variance between allegations and proof, in that the Government proved a number of isolated smaller conspiracies rather than a single, overall conspiracy. Assuming, it is said, that Haith conspired with Hiatt and possibly Kensil, the evidence will not support a finding that Haith united with the other defendants "to advance a common undertaking". Great reliance is placed on Kotteakos v. United States, 1946, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557, wherein defendants were in-

dicted for a single general conspiracy to violate the National Housing Act, (12 U.S.C.A. §§ 1702, 1703, 1715, 1731) by inducing lending institutions to make loans which would be offered to the Federal Housing Administration for insurance on the basis of false and fraudulent information. The evidence, however, proved eight or more different conspiracies by separate groups of defendants which had no connection with each other except that all utilized one Brown as a broker to handle fraudulent applications.

Kotteakos is clearly not in point. The evidence here does not prove one conspiracy to produce illicit spirits and a separate, distinct conspiracy to distribute them, with no connection between them except Hiatt's presence within each group. Production and distribution were not independent and unconnected ventures, but interdependent and complementary steps in a single, integrated and overall enterprise to violate the law.

Finally, we are not persuaded that the refusal of Haith's motion for a severance was an abuse of discretion, or that he suffered prejudice thereby. "When many conspire, they invite mass trial by their conduct." Kotteakos v. United States, 1946, 328 U.S. 750, 773, 66 S.Ct. 1239, 1252, 90 L.Ed. 1557.

We conclude that Leroy Haith's contentions are without merit, and his motions will be denied.

As to Jacqueline Haith, we conclude that the evidence will not fairly support a finding that she had knowledge of the conspiracy. Those having no knowledge of the conspiracy are not conspirators. United States v. Falcone, 1940, 311 U.S. 205, 210, 61 S.Ct. 204, 85 L.Ed. 128. Accordingly, her motion for judgment of acquittal will be granted.

### Dominic Sparagno and Richard Ferraro

Hiatt testified to three contacts with Sparagno and Ferraro and one with Ferraro alone between November 1959 and January 1960. On each occasion, Hiatt delivered cases of alcohol from the still on the Old Schmidt Farm. The Government frankly concedes that the proofs fail to show that either defendant had any connection "with containers to which the required federal stamps were not affixed." The evidence failed sufficiently to establish that either defendant had knowledge of the conspiracy. They were, therefore, not conspirators. United States v. Falcone, supra. Accordingly, their motions for judgment of acquittal will be granted.